Filed 8/15/17; Certified for Publication 9/13/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Madison S. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. MARINA F. et al., Defendants and Appellants. | A144936 & A145352 (Alameda County Super. Ct. Nos. SJ14023569 & SJ14023570) |

Andrew C. (minor) came to the attention of the dependency system on September 20, 2014, when—at less than one month old—he was admitted to the hospital with injuries including a skull fracture, bilateral hematomas on both sides of the brain, diffused retinal hemorrhage in his right eye, and multiple old fractures of the ribs. After an extended contested hearing held between February 6 and April 24, 2015, the juvenile court concluded that Andrew's father, L.C. (father), was responsible for the infant's serious injuries and denied father reunification services. Last year, we issued an opinion in response to writ petitions filed by Marina F. (mother) and father seeking extraordinary relief from the juvenile court order terminating mother's reunification services with respect to Andrew and setting a permanency planning hearing pursuant to section 366.26

1

of the Welfare and Institutions Code.[1] (*Marina F. v. Superior Court* (June 13, 2016, A147266 [nonpub. opn.].)  We denied both petitions, concluding that the bulk of the parents' arguments were not cognizable by writ as they involved challenges to the juvenile court's jurisdictional finding that father was responsible for Andrew's injuries and the resulting dispositional order denying father reunification services.  (*Id.* at pp. 10-11.)  These matters, we opined, should be considered only in an appeal from the dispositional order in the case.  (*Ibid.*)  This is now that appeal, and the issue of father's culpability is squarely before us, albeit through the lens of our deferential standard of review.  Having reviewed the record in detail—now on two occasions—we conclude that substantial evidence does support the juvenile court's jurisdictional findings and dispositional orders in this case.  We therefore affirm.

## I.  BACKGROUND

On September 23, 2014, the Alameda County Social Services Agency (Agency) filed a juvenile dependency petition pursuant to subdivisions (a), (b), (e), and (j) of section 300, alleging that one-month-old Andrew and his five-year-old half sibling, Madison S., were at substantial risk of harm due to the serious injuries described above that had been inflicted nonaccidentally on Andrew.  According to Dr. Yered, one of Andrew's treating physicians, an MRI conducted on September 22, 2014, showed "devastating and irreversible" injuries to the infant's brain caused by " 'a lot of force.' "  Further, medical opinion supported the conclusion that the injuries were the result of nonaccidental trauma.  Specifically, Dr. Kim, another treating physician, opined that the skull fracture was acute—that is, it had happened in the last 72 hours—and that Andrew's injuries were of a type usually caused by blunt force trauma or shaking.

The parents reported that the minor was not left alone or around other caretakers and that they did not know how the injuries occurred.  They did state that they noticed a bump on Andrew's head on September 18, along with a rash and some missing hair.  In addition, they saw some bruising behind the minor's ear the next morning.  The parents

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

emailed a photograph of the minor's head to Andrew's pediatrician later that day, but did not receive a reply. Mother finally brought Andrew to the hospital on September 20. The minor was taken into protective custody while hospitalized on September 21, 2014, and Madison was taken into protective custody on September 23. Both children were formally detained at the detention hearing on September 24, 2014. Ultimately, Andrew was placed with his maternal great-grandparents and Madison was placed with her presumed father, Jesse S. (Jesse).

Also on September 24, mother informed the Agency that she had separated from father and was living elsewhere.[2] On September 26, 2014, mother further reported to the Agency that father had confessed to her that he physically abused Andrew, apparently by expressing feelings of remorse about " 'what happened' " to the minor. Specifically, on the previous day—September 25, 2014—mother had cooperated with the police in making and recording a telephone call to father in an attempt to get him to elaborate on the abuse incident (Pretext Phone Call). During the Pretext Phone Call, father told mother: "You have to decide whether or not you think you can forgive me. . . . [Y]ou have to decide whether or not I'm an evil person at heart or whether or not people make mistakes and those mistakes are forgivable." He elaborated: "I think I need to fully explain to you what happened and—and show you what I think happened and show you what I did and show you why I did what I did and . . . the pieces of the puzzle will all come together and everything will make sense and you'll say okay, now I see why that happened." Indeed, father offered repeatedly to "demonstrate what happened," even offering to show mother "the exact motion" that caused Andrew's injuries. When mother asked whether father was sleep deprived or stressed or whether she was not helping enough, father replied: "[M]aybe it was the stress, maybe it was his crying, maybe it was, um, mostly the sleep deprivation." With respect to the earlier injuries to Andrew's ribs, in contrast, father stated: "[T]hat part I don't understand . . . . I don't understand how—how it was just more than once." He confirmed: "[E]verything else was an

---

[2] Mother and father are not married. Father, however, has been declared the presumed father of Andrew, and the two were cohabiting at the time of the incident.

3

accident but all these multiple injuries just don't make sense to me." Later, father acknowledged: "I need to beg for forgiveness from you and for—from (Andrew) and then I need to pray to God for—to be forgiven. . . . I'm sorry that I didn't protect our son." He also indicated that he took "full responsibility" and would get Andrew whatever treatments he needed moving forward.

As a result of the Pretext Phone Call, father was arrested on September 26, 2014, for violation of Penal Code section 273d, willful injury to a child. An amended petition was filed on October 7, 2014, adding, among other things, an allegation detailing this arrest. Nevertheless, both parents continued to deny causing Andrew's injuries.

In its initial jurisdictional and dispositional report filed on October 8, the Agency recommended that both mother and father be offered reunification services with respect to Andrew. In contrast, it was recommended that Madison be placed with Jesse under a family maintenance plan. However, the matter was continued multiple times, and in an Addendum Report filed on December 3, 2014, the Agency changed its position with respect to Andrew, recommending that both parents be denied reunification services pursuant to subdivisions (b)(5) and (b)(6) of section 361.5.[3] Thereafter, in an Addendum Report filed on February 6, 2015, the Agency reported that mother had reconciled with father and moved back in with him. Further, mother had sought an outside medical opinion and as a result—despite father's statements during the Pretext Phone Call—had concluded that Andrew's injuries were the result of birth trauma. She claimed that when she worked with the police to obtain father's taped confession she had done so under duress.

---

[3] According to subdivision (b)(5), bypass of reunification is permitted where the minor was brought within the jurisdiction of the juvenile court under subdivision (e) of section 300 due to the conduct of the parent. (§ 361.5, subd. (b)(5).) Subdivision (b)(6) provides for reunification bypass if the child has been adjudicated a juvenile court dependent due to the infliction of severe physical harm and "the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent." (§ 361.5, subd. (b)(6).)

4

As stated above, the contested jurisdictional and dispositional hearing finally began on February 6, 2015. During the extended hearing, the juvenile court heard testimony from three medical experts: Dr. Barnes, Dr. Hyman, and Dr. Albin. Dr. Barnes—a Stanford-based pediatric radiologist and pediatric neuroradiologist— testified at mother's request that there could be a number of explanations for Andrew's injuries other than abuse, including birth trauma, vitamin D deficiency, or vascular or bone fragility disorders such as Ehlers Danlos syndrome (EDS).[4] Based on the imaging, Dr. Barnes found birth injury to be the most likely explanation, along with some type of vascular or bone fragility disorder, but he could not rule out child abuse as a possible cause. He explained the different ages of bleeding found in Andrew's brain by hypothesizing that there could be rehemorrhage on top of an older injury. However, Dr. Barnes testified without reviewing the minor's medical records, other than certain select radiology reports, without viewing images of the infant's external injuries (in particular the bruising that could be used to help date the skull fracture), and without access to any follow-up testing, including the second skeletal survey of the minor. In addition, Dr. Barnes indicated that it is rare to make a determination of child abuse based on review of imaging alone. Rather, a finding of child abuse is a "more holistic determination" made by all of the relevant experts coming together, including those involved in the social aspects of a case.

Dr. Hyman—a pediatrician who has studied bone science and has testified for the defense in child abuse cases for the last 14 years—also testified, opining that Andrew was not a victim of child abuse.[5] Rather, he stated that the minor could have unrelated

---

[4] Mother testified that she had recently been clinically diagnosed with EDS. However, she had not provided any documentation supporting her assertion and apparently had not had a confirmatory DNA test.

[5] Although a board-certified pediatrician, Dr. Hyman is not board-certified in the specialty of child abuse because he disagrees with the required testing on things that are diagnostic of child abuse, especially in the area of bones. Dr. Hyman acknowledged that the established child abuse community "[p]robably" does not currently accept his theories. Nevertheless, over the objection of the Agency and minors' counsel, the court

bone problems that mimicked the effects of child abuse. Dr. Hyman further testified that most of Andrew's findings could have been caused during the birth process. He admitted, however, that in reaching a diagnosis of child abuse it was important to consider a number of factors, including parent history, medical records, social work evaluations, police records, and mental health histories. In this case, he did not speak to any social workers, review any Agency reports, or receive any police records. Dr. Hyman also did not review any images of Andrew's external bruising, relying instead on the minor's preadmission history relayed to him by Andrew's parents.

Finally, Dr. Albin—a pediatric intensive care physician and child abuse expert for Kaiser—consulted on Andrew's case at the request of his attending physician and testified that nothing other than nonaccidental trauma could be responsible for Andrew's collection of injuries. Preliminarily, it was Dr. Albin's opinion that Andrew's head trauma and the injury to his ribs arose from different incidents, based on the acute nature of the head trauma in contrast to the more advanced level of healing found in the ribs. There was also evidence of older brain bleeding, possibly dating to the same time as the rib fractures, that, in Dr. Albin's opinion, was consistent with the "same mechanism" that caused the newer head injuries. Further, she found evidence that Andrew's more recent trauma—an "acceleration-deceleration" injury that occurs when the brain slams into the skull—was unlikely to have been caused by a fall. Rather, in her opinion, "somebody hit [the minor] and resulted in the acceleration-deceleration injury which injured his brain and his bones and his skin." Since no one had offered any plausible explanation as to how this may have occurred accidentally, Dr. Albin concluded the injury was nonaccidental, even if the person or persons who did it may not have meant to harm the baby.

In addition, Dr. Albin specifically addressed and rejected the idea that Andrew's fractures were the result of birth trauma. In this regard, she testified that the collarbone is the most frequently fractured bone during birth and that it would be extremely unlikely

qualified Dr. Hyman as an expert in pediatrics, pediatric bone injury, and child abuse pediatrics.

that Andrew's ribs would be fractured without having a collarbone fracture at the same time. Dr. Albin also reviewed the minor's birth records, which indicated a vaginal delivery with no extraordinary complications, the obstetrician's note that the baby was easily delivered without trauma, and Andrew's low birth weight (which made skeletal injury less likely). In sum, Dr. Albin opined that skeletal injuries in vaginal births are rare and that Andrew had none of the generally accepted risk factors for such injuries.

Dr. Albin also ruled out underlying bone, metabolic, or genetic disorders. In particular, according to Dr. Albin, Andrew had a second skeletal survey that showed "normal bones, normal density of bones, normal alignment of bones, and resolution and healing of the fractures." Moreover, the minor had metabolic screening, including review of his electrolytes, calcium levels, vitamin D levels, phosphorous levels, and alkaline phosphatase level that showed no evidence of ongoing bone disease. In addition, Dr. Albin's own physical exam showed none of the physical findings associated with the bone disease osteogenesis imperfecta. Further, although EDS involving lax joints is not a condition diagnosable in infants, Dr. Albin noted that Andrew had none of the "very recognizable physical findings" associated with many forms of EDS. Indeed, in her opinion, none of Andrew's injuries were associated with EDS, even if it were to manifest itself in the minor at a later age. Bleeding disorders were also ruled out through standard testing.

Based on all of these findings, Dr. Albin expressly rejected the "defense scenario" in this case—that Andrew had unusually fragile bones that fractured during the birth process and that mother rubbing cradle cap off his scalp subsequently caused renewed injury and bleeding. In particular, Dr. Albin pointed out that Andrew had been growing well over time with no further fractures; that any vitamin D deficiency at birth would not have resolved without medical intervention; that external rubbing of the head would be insufficient to cause internal bleeding or bruising; that Andrew's bruising in a protected area behind the ear was "very typical," indeed "classic," of bruises that are associated with impact injuries; and that the skull fracture was not a spreading or growing fracture because it had, in fact, healed on its own. Under all of these circumstances—and after

reviewing the reports provided by Drs. Hyman and Barnes—Dr. Albin had "[a]bsolutely no reasonable doubt" that Andrew's injuries were nonaccidental.

In addition to the expert testimony, the Pretext Phone Call was introduced into evidence at the hearing. Mother also testified, attributing Andrew's injuries to birth trauma or a genetic condition. Father invoked his Fifth Amendment right against self-incrimination and so did not offer any evidence. The social worker then testified, explaining her recommendation that neither parent receive reunification services. Specifically, she stated that her recommendation changed from offering reunification to reunification bypass because the "level of cooperation" of the parents changed such that services, in her opinion, would not be likely to prevent reabuse. The social worker believed that mother's decision to reconcile with father undermined her ability to protect Andrew without a safety plan, which mother showed no interest in developing.

At the conclusion of the hearing, the juvenile court found the allegations in the amended petition true, stating that Andrew was a minor described by subdivisions (a), (b), and (e) of section 300 and that Madison was described by subdivisions (b) and (j). In particular, the juvenile court found Dr. Albin's testimony to be the most credible of the medical experts. In addition, the court found that father "virtually" admitted that Andrew's injuries were caused by his actions during the Pretext Phone Call, and that the father's statements during that conversation demonstrated a "consciousness of guilt." It therefore concluded by clear and convincing evidence that Andrew had suffered severe physical abuse by father for purposes of subdivision (e) of section 300, and denied father reunification services. In contrast, the court was only able to make a finding under subdivision (e) with respect to mother's conduct—that she knew or should have known of the abuse—by a preponderance of the evidence. It therefore ordered that reunification services be provided to mother in Andrew's case. As for Madison, she was placed in the home of Jesse, her previously noncustodial parent, with a plan to dismiss dependency once an appropriate custody and visitation order could be crafted. At the continued hearing on May 27, 2015, Madison's dependency was dismissed, with joint legal custody of the minor awarded to both parents and physical custody granted to Jesse.

8

Mother and father both filed timely notices of appeal (on April 27, 2015, and May 18, 2015, respectively) challenging the juvenile court's April 24 jurisdictional findings and dispositional orders with respect to Andrew (A144936). Thereafter, mother filed an additional notice of appeal on June 4, 2015, challenging Madison's May 27 dispositional orders (A145352). On July 7, 2015, at mother's request, we consolidated the two appeals for all purposes.

## II. DISCUSSION

### A.    *Jurisdictional Finding Under Subdivision (e) of Section 300*

Father first challenges the juvenile court's finding in Andrew's case that " 'there is clear and convincing evidence that the child comes within the jurisdiction of the court under subdivision (e) of section 300 because of the conduct of the father.' "[6] A child is described by subdivision (e) Section 300 for purposes of juvenile court jurisdiction if "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."[7] Under subdivision (e), so

---

[6] Mother has joined in father's challenge to subdivision (e) jurisdiction based on father's conduct and the resulting denial of reunification services to father, with the caveat that her joinder does not extend to "any insinuation or suggestion set forth by father that mother might somehow have caused Andrew's injuries." The Agency, in contrast, argues that father's claims are not justiciable because he did not challenge all of the juvenile courts jurisdictional findings, in particular the finding under subdivision (a) based on the same circumstances. We discuss justiciability at length below in connection with mother's independent jurisdictional challenge. With respect to father's claim of error, while the better course would clearly have been to appeal from all of the jurisdictional findings, we will nevertheless reach the merits, as the juvenile court's identification of father as the perpetrator of the abuse is central to this case and, not only serves as the basis for dispositional orders that are also challenged on appeal, but also could clearly impact father in current or future dependency proceedings. (See *In re D.M.* (2015) 242 Cal.App.4th 634, 638-639 (*D.M.*).)

[7] Pursuant to subdivision (e), severe physical abuse is defined as including, among other things, "any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death" or "more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or

9

long as a parent has actual or constructive knowledge that abuse has occurred, it is not necessary that the parent knows the severity of that abuse, some of which may not be visible. (*In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1729-1730.) Proof by a preponderance of the evidence is necessary to support a jurisdictional finding under subdivision (e). (§ 355, subd. (a).) However, in order to impact the provision of reunification services at disposition, a subdivision (e) finding must be based on clear and convincing evidence. (§ 361.5, subd. (b)(5).)

On appeal, "[a] dependency court's jurisdictional findings are reviewed under the substantial evidence test. [Citation.] Under this test, we resolve all conflicts in the evidence, and indulge all reasonable inferences that may be derived from the evidence, in favor of the court's findings." (*In re Mia Z.* (2016) 246 Cal.App.4th 883, 891.) "The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 (*Dakota H.*).) Importantly, issues of credibility in this context are questions for the trier of fact. (*In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1451-1452 (*Cole Y.*).) Substantial evidence may include inferences, so long as any such inferences are based on logic and reason and rest on the evidence. (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393.)

In this case, in order to make its subdivision (e) finding, the juvenile court first had to determine whether Andrew's serious physical injuries were the result of abuse or some other circumstance. It then had to assign culpability, if possible. We find the juvenile court's analysis on both points instructive, and thus set it out at some length.

With respect to the conflicting testimony on the issue of abuse, the court initially found all three experts to be credible witnesses, noting that "all three have images, facts and figures on which to support their positions." However, the court ultimately found Dr.

unconsciousness." (§ 300, subd. (e).) Assuming they were not birth-related, no party here contests the fact that Andrew's injuries meet the definition of "severe physical abuse" for purposes of subdivision (e).

Albin's testimony to be "the most persuasive and the most credible." It stated the reasoning underlying this credibility determination in detail: "Unlike Drs. Hyman and Barnes, Dr. Albin had the benefit of hands-on examinations, face-to-face examinations of Andrew, she had the benefit of the review of follow-up examinations that were used to determine whether Andrew had any predisposing conditions that could explain his injuries. [¶] Follow-up examinations ruled out bleeding disorders, bone disorder. There were metabolic screens that checked calcium levels, phosphorous levels, alkaline phosphates and vitamin D, all of which Dr. Albin reviewed. [¶] Dr. Albin also testified that Andrew had follow-up x-rays, a check of his electrolytes, follow-up skeletal survey, all of which she testified were normal, showed no evidence of either pre-existing conditions or fragile bones. [¶] In addition, Dr. Albin testified that she reviewed the testimony and had the benefit of reviewing the testimony of both Dr. Hyman and Dr. Barnes. After that, she went back and reviewed the medical literature to see if she had missed anything in light of the testimony of both Dr. Barnes and Dr. Hyman and she testified that her review of the literature confirmed her assessment of the case. [¶] So the Court accepts Dr. Albin's testimony that the constellation of injuries suffered by Andrew in this case were caused by blunt force trauma and not by injuries caused in the process of Andrew being born."

The juvenile court found Dr. Albin's testimony even more persuasive in light of father's statements in the Pretext Phone Call. Indeed, with respect to culpability for the abuse, the juvenile court declared: "In that phone call, in the Court's opinion, the father virtually admits that Andrew's injuries were caused by his actions. Throughout the phone call, the father makes statements such as, 'If you let me demonstrate what happened, you'll see,' and statements such as how the accident happened and, 'Did you think I did it on purpose.' Then he goes on to say, that's one of the arguments that was made in court today, that he needed to beg for the forgiveness of both the mother and Andrew, pray to God for forgiveness, and he needed to get on his knees to beg for forgiveness. [¶] If the father was not responsible for Andrew's injuries, one would expect that even in an unguarded moment or in an unguarded situation, a complete and

11

unequivocal denial would have been made by the father. The Court believes that the father's comments and statements during the course of that pretext phone call demonstrates a consciousness of guilt on the part of the father. . . [¶] . . . [¶] As far as the Court is concerned, it's the Court's opinion that there's clear and convincing evidence as to the father and the allegations of [300] (e) in that the Court finds by clear and convincing evidence that the child was under the age of five and has suffered severe physical abuse by the parent, that parent being the father."[8] After our own review of the record as summarized above, we have no difficulty concluding that this analysis by the juvenile court was reasonable, logical, and well-grounded in substantial evidence.

Father, however, while acknowledging this court's standard of review, argues at some length that the juvenile court's jurisdictional finding under subdivision (e)—specifically, the court's conclusion that he was the cause of Andrew's injuries—was not supported by substantial evidence. Instead, father posits, substantial evidence shows that both the perpetrator and the cause of Andrew's injuries are unascertainable. Father relies on a number of different arguments in support of his position, none of which we find persuasive.

For instance, father contends that the juvenile court improperly relied on the Pretext Phone Call in finding him culpable under subdivision (e) for causing Andrew's injuries because, throughout that call, father never admitted to any intentional act, but instead consistently referred to the incident in which Andrew was most recently injured as an "accident." In addition, father stresses, the Pretext Phone Call makes clear that he was completely unaware of any prior injuries to Andrew. We believe, however, that the Pretext Phone Call—including father's repeated use of the term "accident"—is entirely consistent with a situation where father committed multiple intentional acts of abuse, but perhaps did not necessarily intend to harm the child, was not able or willing to accept full responsibility, and/or did not initially understand the severity of some or all of the

---

[8] The juvenile court also found by a preponderance of the evidence that mother knew or should have known that Andrew was being abused by father for purposes of subdivision (e) jurisdiction, a finding that no party has challenged on appeal.

injuries caused by his actions. Moreover, what father does expressly admit during the course of the extended telephone call is quite telling: He states, in sum, that he committed an act—most likely due to sleep deprivation, stress, and/or Andrew's crying— that caused Andrew's most recent injuries and for which he needed to beg forgiveness.[9] The juvenile court viewed the Pretext Phone Call as tantamount to an admission by father that he had physically abused Andrew, and we are unable to draw any other reasonable conclusion from its contents. Indeed, mother, herself, apparently felt the same way, as she told the social worker the next day that father had "confessed" to her that he was responsible for injuring the baby. Under such circumstances, we see no error in the juvenile court's characterization of, or reliance on, the Pretext Phone Call.

Father also highlights the evidence in the record that could support a finding that mother was actually the perpetrator of the abuse. For instance, it is undisputed that Andrew was in the sole care of his parents since his hospital discharge following his birth. Father, however, argues that mother was Andrew's primary caretaker; that she only left the baby alone with father on one occasion, when she went to Madison's back-to-school night; and that, although father took over watching Andrew for mother in the evenings while she napped, mother never heard the baby crying abnormally. Thus, according to father, his opportunity to inflict injury as compared to mother was extremely low. And, father notes, mother is the only parent mentioned in the petition as having questionable discipline or parenting practices, due to her spanking of Madison with a spoon and belt. In addition, father points out that mother declined mental health services both at Andrew's birth and at the time of his subsequent hospitalization, despite the fact that she apparently had a history of major depression. According to Dr. Albin, untreated

---

[9] That father would even say this much is somewhat remarkable, as he was clearly worried he was being recorded and that mother was cooperating with the police. When mother went to the house before the Pretext Phone Call, father made her take off all of her clothes to prove that she was not wearing a wire. And he refused to discuss any specifics over the phone, stating that any further conversation needed to be in a controlled situation. It is reasonable to infer that father would not have been so concerned about being recorded if he had no culpability for Andrew's injuries.

depression is a risk factor for abuse—for " 'having a difficult time with a difficult baby.' " As another example, father stresses Dr. Albin's testimony that, when she informed mother that the MRI scan confirmed that Andrew had head injuries on at least two different occasions, mother asked no questions about the baby's prognosis or next steps in treatment. Rather, mother simply thanked the doctor for the information and said goodbye. Dr. Albin found this unusual. While the doctor thought it was possible that mother's lack of emotion could have been due to depression, she further testified: "[I]n my opinion, it could also be possible that she's not surprised that there were both acute and older injuries."[10] Finally, although mother mentioned in the Pretext Phone Call that Andrew had, at some point, stopped breathing, she never shared this important information with Dr. Albin.

None of the circumstances father emphasizes, however, are necessarily inconsistent with the juvenile court's finding that father was the perpetrator of Andrew's injuries, especially if one considers the court's additional, unchallenged finding that mother knew or should have known that father was abusing the minor. Moreover, while father can certainly highlight evidence tending to paint mother as the potential bad actor in this case, he declines to mention the other evidence, even beyond the Pretext Phone Call, which could be viewed as further implicating him.[11] Regardless, in the end, it was

---

[10] Presumably to mitigate any fault ascribed to him, given his statements in the Pretext Phone Call, father hypothesizes that Andrew's last injury—whether accidental or not—might have been made more severe by the fact that multiple injuries (arguably caused by mother) preceded it.

[11] For instance, both the maternal great-grandmother and father's ex-wife independently reported that father called Madison the " 'devil-child.' " Father's ex-wife additionally indicated that father had not seen his own eight-year-old daughter for eight months, although she did not stop him from doing so. According to the ex-wife, she divorced father because he was having sex with prostitutes. When she confronted father about his relationship with mother—because he was 41 and mother was 24—father reportedly told her that he was only with mother so that he wouldn't need to pay prostitutes for sex. He did not introduce mother to his family until she was nine months pregnant. Father also admitted to being under stress because he was changing jobs and had to care for Andrew while preparing for his new job. After the incident, he actively tried to discourage

up to the juvenile court to weigh all of the evidence, whether conflicting or not, and make a determination regarding culpability. So long as that determination was supported by substantial evidence—which we believe that it was—we will not here disturb it. (See *Dakota H.*, *supra*, 132 Cal.App.4th at p. 228 [existence of substantial evidence supporting a contrary result is irrelevant on appeal where substantial evidence also supports the judgment].)

We are similarly unimpressed by father's attempt to implicate Madison in Andrew's abuse. It is true that the initial petition in this matter contained the following allegation: "[M]other stated that approximately two weeks ago she left Andrew on her bed cushioned with pillows and when she returned, Madison was holding Andrew, cradled in her arms. Mother stated that Madison said 'I made a mistake' and that she should not have picked up the baby." However, Dr. Albin testified that Andrew's injuries would not have been caused by a fall, nor would a child have had sufficient power to cause them. Thus, it was proper for the juvenile court to discount this red herring in its analysis. And, indeed, the court struck the allegation at the end of the hearing in response to the Agency's motion to conform to proof.

Father next asserts that the juvenile court's subdivision (e) finding is somehow fatally flawed because the "devastating and irreversible injury(s) theory" issued by Andrew's treating physician, Dr. Yered, has been "virtually debunked" by Andrew's subsequent positive health reports. The petition in this matter contains the following statement from Dr. Yered: "[T]he MRI conducted on 09/22/2014, shows that the minor, Andrew [C.], has incurred devastating and irreversible injuries to his brain as there are areas of his brain that are 'dark,' there was a lack of oxygen, and a lack of blood supply as well. The injuries were caused by 'a lot of force.' " It is true that, at a follow up appointment on January 20, 2015, Andrew's pediatric neurologist stated in regards to the

_____

mother from taking Andrew to the hospital, did not accompany mother when she finally went, and did not visit Andrew after he was admitted. And, when mother mentioned during the Pretest Phone Call that Andrew had stopped breathing, father did not act surprised by this information.

15

minor: "Currently, [Andrew's] neurologic examination is unremarkable with no signs of focal neurological deficits or signs of increased intracranial pressure. He is doing well developmentally without clinical seizure." Andrew's caretaker was advised to continue to monitor the infant for signs of seizure and developmental milestones. We find puzzling father's suggestion that this happy fact—that his son is not currently showing overt signs of major developmental impairment—somehow makes subdivision (e) jurisdiction in this matter unwarranted. Indeed, it is not until his reply briefing that he even suggests a basis for this argument, claiming that the fact that Dr. Albin's prognosis was wrong undercuts her overall credibility.

Again, we are not convinced. First, the minor's condition was, unfortunately, not as positive as father suggests. Specifically, while acknowledging that Andrew's pediatric neurologist was "optimistic" about his outcome, Dr. Albin testified that Andrew had been having some abnormal movements in his legs that could indicate long-term neurologic problems. More importantly, Dr. Albin also testified that Andrew's current condition did not alter her original findings in his case in any way, because the injury to the infant's brain had been so diffuse. Specifically, she opined: "If he had had a stroke or a ruptured blood vessel or if he had a brain tumor or some metabolic disorder, I would expect him to have very focal neurologic abnormalities. A metabolic disease that causes brain hemorrhages, basically over time, children tend to get worse. They tend to have other neurologic symptoms. In my opinion, having a normal neurologic examination at four months of age are good prognostic findings. They are hopeful. They are consistent with the level of injury that we see which we hope is reversible, but, again, I cannot guarantee that as the neurologic exam becomes more sophisticated, as we ask whether or not he can do arithmetic or multiplication or have good memory or to solve problems, I can't guarantee that those cognitive functions are not affected by this diffuse brain injury." We join in the fervent hope that Andrew will continue to progress positively as he grows older. The dispute among the experts in this case, however, was not over whether Andrew was seriously injured, but instead focused on the *cause* of those serious injuries. If anything, Dr. Albin's testimony appears consistent with her opinion that Andrew was

16

the victim of nonaccidental trauma rather than some ongoing disease process. Further, even were we to find some logic in father's assertion that Andrew's current condition somehow undermined Dr. Albin's overall credibility, we would not here supplant the juvenile court's credibility determination with our own. (*Cole Y.*, *supra*, 233 Cal.App.4th at pp. 1451-1452.)

In a final attempt to avoid the juvenile court's culpability finding under subdivision (e), father argues that the juvenile court erred in this case by not following the reasoning of *L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285 (*L.Z.*) and *In re E.H.* (2003) 108 Cal.App.4th 659 (*E.H.*), which allow for jurisdiction pursuant to subdivision (e) and the possibility of reunification services when the perpetrator of the abuse cannot be ascertained. In *L.Z.*, the appellate court acknowledged that section 300, subdivision (e), does not require identification of the perpetrator. (*L.Z.*, *supra*, 188 Cal.App.4th at p. 1292.) The court then opined: "[A]s a matter of fairness, the court should not require one parent to admit to physically abusing the baby in order for the other parent to be eligible for reunification services. . . . Baby Z.Z. suffered severe physical abuse. But the statutes do not permit the court to deny a parent reunification services simply because it cannot determine who inflicted the abuse unless it is proven that the parent knew or should have known the baby had been abused." (*Id.* at pp. 1293-1294.) In *E.H.*, a number of people resided in the family home where the infant sustained multiple broken bones, but there was no evidence regarding which family member caused the injuries. (*E.H.*, *supra*, 108 Cal.App.4th at pp. 661-666.) In reversing the juvenile court's refusal to find jurisdiction pursuant to subdivision (e), the appellate court opined that the only requirement under subdivision (e) is that the parents "reasonably should have known" the infant was being injured. (*E.H.*, *supra*, 108 Cal.App.4th at p. 667.) The *E.H.* court further opined: "[W]here there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out. A finding may be supported by circumstantial evidence as it is here. Otherwise, a family could stonewall the Department and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding under subdivision (e)." (*E.H.*, *supra*, 108

17

Cal.App.4th at p. 670.) Father basically argues that, once the juvenile court in this case declined to adopt the theory that Andrew's injuries were caused by birth trauma, it should have concluded that it could not determine whether it was mother or father who inflicted the abuse on the minor as permitted by *L.Z.* and *E.H.*

While we do not disagree with the holdings in *L.Z.* and *E.H.*, we find them completely irrelevant to the case at hand. In short, father overlooks the crucial distinction that, in the instant matter, the juvenile court *did* specifically identify father as the perpetrator of the minor's abuse and, as we have found, substantial evidence supports that determination. Thus, as much as father would like to live in the world of *L.Z.* and *E.H.* in order to avoid some of the harsher consequences resulting from the juvenile court's subdivision (e) finding, he plainly resides elsewhere.

In sum, we do not believe that any of father's myriad of allegations are sufficient to fatally undercut the substantial evidence supporting the juvenile court's true finding with respect to the subdivision (e) allegation in this case, including the court's conclusion that father was the perpetrator of the abuse. Rather, father has, in essence, repeatedly asked us to reweigh the evidence, discard the juvenile court's thoughtful credibility determinations, and blatantly disregard our appellate standard of review. This we decline to do.

18

**B.**   *Dispositional Bypass Order*

Father also challenges the juvenile court's dispositional order denying him reunification services pursuant to subdivisions (b)(5) and (b)(6) of section 361.5. As only one valid ground is necessary to support a juvenile court's decision to bypass a parent for reunification services, we will focus here on the court's bypass determination pursuant to subdivision (b)(5). As mentioned above, denial of reunification is mandated in accordance with subdivision (b)(5) where the juvenile court finds, by clear and convincing evidence, that the minor was brought within the jurisdiction of the juvenile court under subdivision (e) of section 300 due to the conduct of the parent. "Pursuant to section 361.5, subdivision (c), if a juvenile court finds the subdivision (b)(5) circumstances to be supported by clear and convincing evidence, the juvenile court is *prohibited* from granting reunification services 'unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent.' " (*In re A.M.* (2013) 217 Cal.App.4th 1067, 1074-1075 (*A.M.*).) "The standard of review of a dispositional order on appeal is the substantial evidence test, 'bearing in mind the heightened burden of proof.' " (*In re A.E.* (2014) 228 Cal.App.4th 820, 826; see also *A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 242.)

As discussed at length above, the juvenile court in this case made the express finding, by clear and convincing evidence, that Andrew was brought within the jurisdiction of the juvenile court under subdivision (e) of section 300 due to the conduct of father, a finding which we uphold on appeal. Thus, on its face, subdivision (b)(5) applies and supports the court's resulting denial of reunification services. Father, however, makes a number of diffuse and inter-related arguments that, despite the subdivision (e) finding, he still should have been offered a reunification plan. For example, father makes much of the Agency's change of recommendation in this case—from offering reunification services to both parents to bypassing both parents for reunification. Specifically, he argues that the Agency impermissibly based its change in

19

recommendation on the fact that neither parent would admit to causing Andrew's injuries, a so-called " 'confession dilemma.' " (See *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1752-1753 (*Blanca P.*).) In addition, father claims that the social worker failed to properly investigate whether reunification services would benefit Andrew. And, he also asserts that the court should not have denied services to father, once it ordered a reunification plan for mother.

With respect to father's last argument—that the court should have granted reunification services to father because mother was granted services and they were an intact couple—it is clear that father has misapprehended the juvenile court's discretion to grant or deny reunification services under the circumstances of this case. Indeed, father seems to suggest that, in ordering reunification services for mother, the court somehow found that those services would be in the minor's best interest, or at the very least, not detrimental to the minor. Thus, he argues, supporting mother's efforts through services to father was also warranted. To the contrary, the juvenile court granted mother services in this case because it was statutorily obligated to do so once it concluded that it had no grounds for bypass pursuant to section 361.5, subdivision (b). (See § 361.5, subd. (a) ["[e]xcept as provided in subdivision (b), . . . whenever a child is removed from a parent's . . . custody, the juvenile court *shall order* the social worker to provide child welfare services to the child and the child's mother," italics added].) It was not a discretionary act. Similarly, once the juvenile court found subdivision (b)(5) applicable with respect to father, it was *prohibited* from ordering reunification services for father, unless it expressly found that those services were "likely to prevent reabuse."[12] (§ 361.5, subd. (b)(5) & (c)(3); *A.M.*, *supra*, 217 Cal.App.4th at pp. 1074-1075.) No such finding was made in this case, and thus the court had no discretion to provide services to father, whether he was living with mother or not.

---

[12] Services can also be ordered in these circumstances if "failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c)(3).) No party has argued that there is any evidence of a close and positive attachment between father and Andrew, who was removed from father when he was not even one month old.

Father, however, also argues that the social worker in this case failed in her statutory mandate to advise the court whether reunification services should properly have been ordered. Specifically, subdivision (c)(3) of section 361.5 provides that, where circumstances exist justifying (b)(5) bypass, "[t]he social worker shall investigate the circumstances leading to the removal of the child and advise the court whether there are circumstances that indicate that reunification is likely to be successful or unsuccessful and whether failure to order reunification is likely to be detrimental to the child." (§ 361.5, subd. (c)(3).) Here, the social worker did advise the court that she did not believe services would be likely to protect Andrew. Specifically, she stated that she was recommending that reunification services not be provided "because the nature of the injuries that this very young child sustained, that to date, I haven't gotten a reasonable explanation, any explanation from the caretakers, the sole caretakers of this young child. So reunification without some kind of indication of the cause, reason, how it's going to be prevented in the future, I don't know. [¶] So going to parenting classes, being involved in counseling, visiting, does not give me a lot of confidence about the future safety of Andrew if he's reunified with both of the parents."

The social worker further indicated that she switched her recommendation from reunification to no reunification because the parents' level of cooperation changed such that she did not think services would be likely to prevent reabuse. In particular, mother had initially identified father as the perpetrator and had taken steps that indicated she might be able to keep her children safe. But, after mother reconciled with father, she did not discuss with the social worker what her safety plan would be. Moreover, she denied Andrew's injuries were nonaccidental, which reflected on mother's "ability to protect the child from anyone." The social worker also indicated that father's statements in the Pretext Phone Call caused her concern with respect to Andrew's possible reabuse. She additionally noted as a risk factor father's lack of any support system, as he had only limited contact with his family. Finally, she testified that, even if the parents were to change their position and acknowledge some involvement in causing Andrew's injuries, there would be "more work needed to be done" and she found it unlikely that this

21

necessary work could be completed in the timeframes applicable to reunification for children under the age of three. The social worker thus explained, based on her extensive knowledge of the case, why she believed reunification would be unsuccessful and/or unsafe for Andrew. We see no error.

This leaves father's argument, based on *Blanca P.*, that it was improper to condition his reunification services on either he or mother accepting responsibility for Andrew's injuries. In *Blanca P.*, the appellate court was faced with a situation where significant evidence indicated that the father had been falsely accused of sexual molestation; the juvenile court had failed to consider seriously the allegation in finding jurisdiction on a subsequent petition; and the father's continued denials negatively impacted his ability to reunify. (*Id.* at pp. 1741-1747.) Under such circumstances, the *Blanca P.* court stressed the "critical importance" of jurisdictional hearings under the juvenile court law: "The hearing on a contested petition alleging child sexual abuse is thus, to repeat, extraordinarily important. It is not the sort of thing to be rushed, or taken routinely. Allegations of child molestation are *serious*; they merit more than a rubber stamp." (*Id.* at pp. 1752, 1754.) Since the sexual abuse allegation had not been properly considered by the juvenile court, the *Blanca P.* court remanded the matter so that the issue could be "*fully* explored and resolved." (*Id.* at p. 1759.) Here, in obvious contrast, the issue of father's culpability was extensively and thoughtfully explored by the juvenile court, and the court expressly found that Andrew was the victim of nonaccidental injury at the hands of father. It is possible that services for father might have been appropriate without an unequivocal admission of guilt on his part, if, for example, mother was willing to take affirmative steps to keep the child safe and/or both parents agreed that Andrew was a victim of abuse and should be treated as such. Here, however, neither parent was even willing to acknowledge that nonaccidental injury occurred, conduct amounting to "a willful denial of the injuries themselves." (See *A.M.*, *supra*, 217 Cal.App.4th at p. 1078.) On these facts, it is difficult to imagine how any services would have been likely to prevent reabuse. (See *ibid.*) Moreover, father certainly did not provide any evidence on this point, and it was his burden to do so. (See *In re William B.* (2008) 163 Cal.App.4th

22

1220, 1227 [once conditions for bypass are established it is assumed that offering reunification services would be an unwise use of governmental resources; burden is on parent to change that assumption].)  We thus find no cause to disturb the juvenile court's dispositional order in this case.

## C.    *Mother's Jurisdictional Challenge:  Justiciability*

In addition to joining in certain of father's appellate arguments as stated above, mother has separately appealed challenging another of the juvenile court's jurisdictional determinations, its finding under subdivision (b) of section 300 that she disciplined Madison with a spoon and a belt (the b-4 allegation).[13]  This allegation was based on Madison's report that mother would spank her with a red spoon, her hand, or a belt when frustrated.  According to Madison, mother spanked her on the butt, and she would cry because it hurt.  The minor did not know if the spoon was wooden or plastic, but she was able to indicate that it was stored under her bed.  According to the jurisdictional report, mother admitted that she had spanked Madison on occasion, but never with any type of instrument or belt.  At the conclusion of the contested jurisdictional hearing, the juvenile court found the b-4 allegation true without comment.  It then declared Madison to be a child described by subdivision (b) and (j) of section 300.

Although mother asks us to reverse the juvenile court's "true finding" with respect to this spanking allegation, she does not assert on appeal that the allegation is factually incorrect or somehow unsupported by substantial evidence.[14]  Instead, mother devotes her entire appellate argument to the premise that the b-4 allegation is insufficient, standing

---

[13] The b-4 allegation states in full as follows:  "On or about September 23, 2014, a forensic interview was conducted with the minor, Madison [S.], who stated that her mother told her to 'shut up' and told the minor Andrew [C.] to 'shut up'; Madison also stated that the mother has disciplined her with a spoon and a belt."

[14] Indeed, it would be difficult for mother to do so, as the juvenile court impliedly found Madison credible after viewing her taped interview.  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451 (*Alexis E.*) ["[w]eighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court"; evidence from a single witness sufficient to support a trial court's findings].)

alone, to support a finding under subdivision (b) of section 300. However, while pressing her claim under subdivision (b), mother does not contest the juvenile court's finding pursuant to subdivision (j) of section 300 that Madison was at substantial risk of being abused or neglected based on the injuries sustained by Andrew and the fact that she was subjected to the same discipline and parenting practices as her young half-sibling. Under these circumstances, we decline to consider the propriety of the b-4 allegation on justiciability grounds.

Pursuant to the doctrine of justiciability, " ' "[a] judicial tribunal ordinarily may consider and determine only an existing controversy, and not a moot question or abstract proposition." ' " (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490 (*I.A.*).) Application of the doctrine of justiciability in the dependency context leads to the conclusion that "[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*Alexis E., supra,* 171 Cal.App.4th at p. 451.) This is true because no effective relief could be granted in such a situation, as jurisdiction would be established regardless of the appellate court's conclusions with respect to any such additional jurisdictional grounds. (See *I.A.*, *supra*, 201 Cal.App.4th at p. 1490 ["[a]n important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status"].) Here, as stated above, mother does not challenge the juvenile court's finding that Madison is a minor described by subdivision (j) of section 300. Moreover, we have upheld the juvenile court's findings regarding Andrew's abuse, which support this sibling allegation. Thus, the juvenile court's jurisdiction over Madison would remain regardless of any determination by this court with respect to the b-4 allegation, and the matter is therefore not justiciable.

24

Anticipating this result, mother asserts that we should nevertheless address the propriety of the spanking allegation. It is true that a reviewing court does have the discretion to consider the adequacy of additional jurisdictional grounds if it so desires. (*I.A.*, *supra*, 201 Cal.App.4th at p. 1493.) Other courts have done so when an allegation may be prejudicial to the appellant "such as when that finding 'serves as the basis for dispositional orders that are also challenged on appeal' or when that finding 'could potentially impact the current or future dependency proceedings.' " (*D.M.*, *supra*, 242 Cal.App.4th at pp. 638-639; see also *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.) In this case, mother argues that we should reach the merits of her claim because, if the spanking allegation is not vacated, she faces "serious potential for negative consequences" in both juvenile and family court proceedings. In particular, mother contends that this single allegation "makes the difference between mother actively perpetrating abuse on the one hand, particularly physical abuse, and on the other hand being guilty of negligence or unjustified ignorance" based on father's abuse of Andrew. We, however, are not convinced our resolution of mother's claim would have "a single specific legal or practical consequence . . ., either within or outside the dependency proceedings." (*I.A.*, *supra*, 201 Cal.App.4th at p. 1493.)

Rather, we find mother's failure to argue on appeal that the b-4 allegation is untrue, or at least unsupported by the evidence, fatal to her position. Under such circumstances, it is purely an academic question whether such an allegation, standing alone, is sufficient to support dependency jurisdiction under subdivision (b). Indeed, in this case, the determination mother requests is even more divorced from reality because the allegation she challenges is not the only allegation supporting the juvenile court's subdivision (b) finding, and she finds no fault with the other two. Moreover, the substance of the spanking allegation would almost certainly be available in any future dependency or family court proceeding, regardless of any determination on our part as to whether it formed an independent basis for juvenile court jurisdiction. In short, on these

25

facts, we see no meaningful prejudice we could dispel by reaching the merits of mother's claim.[15]  We therefore decline to review it.

### III.  DISPOSITION

The juvenile courts jurisdictional findings and dispositional orders with respect to both minors are affirmed.

---

[15] While we have chosen to analyze this issue in terms of justiciability, we note that both mother and the Agency refer to justiciability and mootness with regards to this question, and precedent with respect to mootness in the dependency context is both instructive and supportive of our result.  In particular, "the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error."  (*In re N.S.* (2016) 245 Cal.App.4th 53, 60, 62-63 [noting that, while it understood "the desire of parents to challenge negative findings made about their parenting in dependency proceedings," where the mother did not contest the operative facts contained in the allegations, which "would almost certainly be available in any future dependency proceedings," mother failed to show any meaningful adverse effect from the continued existence of the jurisdictional findings, themselves].)

26

_____

REARDON, J.


We concur:


_____

RUVOLO, P. J.


_____

RIVERA, J.

Filed 9/13/17

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL

FIRST APPELLATE DISTRICT

DIVISION 4

In re Madison S. et al., Persons Coming Under the Juvenile Court Law.

_____

ALAMEDA COUNTY SOCIAL SERVICES AGENCY,

Plaintiff and Respondent,

v.

MARINA F. et al.,

Defendants and Appellants.

A144936 & A145352

Alameda County No. SJ14023569, Alameda County No. SJ14023570

BY THE COURT:

The two requests for publication-from the Alameda County Social Services Agency and from the California State Association of Counties-are each granted.

The written opinion which was filed on August 15, 2017, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is ordered published in the official reports.

(Ruvolo, P.J., Reardon, J. and Rivera, J. participated in the decision.)

Date: ___September 13, 2017_____    _____Ruvolo,_____ P.J.

1

Trial Court:                    Alameda County Superior Court


Trial Judge:                    Hon. Willie Lott, Jr.


Counsel for Appellants:         The Law Offices of Johnson & Johnson
                                Carin L. Johnson (Mother)

                                Christopher Booth (Father)



Counsel for Respondent:         Office of the Alameda County Counsel
                                Deputy County Counsel
                                Donna R. Ziegler
                                Samantha N. Stonework-Hand