Filed 6/12/23 In re Natalya M. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re NATALYA M., a Person Coming Under the Juvenile Court Law. | B318436 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUAN M.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 21CCJP05732A |

APPEAL from orders of the Superior Court of Los Angeles County. Marguerite D. Downing, Judge. Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Father, Juan M., appeals orders of the juvenile court (1) exercising jurisdiction over his daughter, Natalya M., pursuant to Welfare and Institutions Code[1] section 300, and (2) removing Natalya M. from his custody pursuant to section 361.  We affirm.

## BACKGROUND

Natalya M. was born to father and mother, Sasha C., in December 2021.  Though they have been, and remain, in a long-term relationship, mother and father do not live together.  Father has 16-year-old twins from a prior relationship.  Their mother lives out of state, and father lives with and raises his older children alone.

At the time of her birth, both Natalya and mother tested positive for methamphetamine.  Natalya exhibited withdrawal symptoms.  The hospital referred the matter to the Los Angeles County Department of Children and Family Services (Department).

The Department began its investigation two days after Natalya's birth.  It first interviewed the hospital's social worker, who had discussed mother's positive toxicology screen with her.  According to the hospital social worker, mother admitted to a long history of methamphetamine use, including using methamphetamine two to three times per week during her pregnancy.  She reported most recently using four days prior to Natalya's birth.  She also reported a history of depression and anxiety.  Mother further reported father uses methamphetamine and abuses alcohol.  She said he is verbally abusive towards her, which triggers her methamphetamine use.  Father's verbal abuse

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

was corroborated by a nurse who witnessed it firsthand. The hospital social worker described mother as "tender with the child and . . . open and honest."

The Department next interviewed the nurse who was caring for Natalya and initially reported mother's and Natalya's positive toxicology screens. She shared details about Natalya's withdrawal symptoms and repeated what the social worker reported about mother's methamphetamine use. The nurse also shared her observations about father. She said that on the day of Natalya's birth he "appeared to be 'high.'"

The Department next interviewed maternal grandmother. She confirmed mother had started using methamphetamine eight years prior, took a six-year hiatus after a year of use, and then resumed using a year ago. Maternal grandmother was unsure whether father was currently using methamphetamine but thought he may have used previously. She denied knowledge of domestic violence between mother and father, but said father is verbally aggressive towards mother.

The Department next interviewed father. When informed of Natalya's positive toxicology results, father responded "impossible." Father denied knowing whether mother used drugs during pregnancy, explaining that he lives apart from her, with his older children, and mother lives with her uncle. Father explained he is trying to find a bigger home so that he and mother can reside together with the children. When pressed further about mother's substance abuse, father stated "I don't know anything. I'm surprised . . . she [tested] positive." Father denied using drugs and alcohol and accused the nurse who said he looked "high" the day before of lying. He declined to drug test that day but offered to test the next day.

The Department next interviewed mother. After initially saying she used methamphetamine only "once in a while" during her pregnancy, mother eventually admitted she used two to three times per week, as reported to the nurse and hospital social worker. She generally confirmed what maternal grandmother said about her usage history—that she started, then stopped for six years, then resumed use more recently. She reported that father uses methamphetamine "once in a while," and that they had used together in the past. She further reported that father drinks alcohol, though not daily, and that he is verbally and emotionally, though not physically, abusive towards her.

Mother, father, and maternal grandmother consented to removal of Natalya and placement with maternal grandmother. Mother and father agreed not to have unsupervised contact with Natalya.

Four days after Natalya's birth, the Department filed a petition in the juvenile court. The petition contained four counts, all for failure to protect under section 300, subdivision (b)(1). Count b-1 was against mother only relating to her drug use during pregnancy and Natalya's resultant withdrawal symptoms. Count b-2 was against both mother and father, based on, respectively, mother's current substance abuse and father's failure to protect Natalya from the effects of such abuse. Count b-3 was against father only for abuse of methamphetamine and alcohol. Count b-4 was against mother only relating to her unresolved mental health and emotional issues.

Following a hearing, the juvenile court ordered Natalya detained and set a jurisdictional and dispositional hearing for February 2022.

In the Department's jurisdictional and dispositional report filed in advance of that hearing, the Department disclosed new information about the family and a changing narrative about parents' substance use. First, it noted father had three prior child referrals concerning his older children with father's previous partner. The first referral, from 2009, alleged the previous partner smoked marijuana in the children's presence and blew smoke in their faces, and that father used cocaine and left cocaine within reach of the children. Both parents were alleged to be physically abusive towards the children. The second referral, from 2016, alleged father was delivered to the emergency room by ambulance after he tried to drive with his children in the car but was stopped by his own vomiting. His toxicology report at the hospital was positive for methamphetamine and cocaine. He conceded only alcohol use at the time. The third referral, from 2017, alleged physical abuse by father to his older son and attendant risk to his older daughter.

In a January 2022 discussion with the Department social worker, mother disclosed that she used methamphetamine more frequently during her pregnancy and closer to Natalya's birth than previously disclosed. She admitted to using throughout her pregnancy, "sometimes once a day and usually [two] to [three] times a day," and most recently the day before Natalya's birth. She attributed her heavy use to the fact that "the father and her would always be fighting," which she characterized as "loud arguments." Further, she retracted her statement that father uses drugs. She claimed her hospital report that she and father used together was a product of drugs in her system at the time.

The Department reinterviewed father in January 2022 as well. He claimed not to understand why Natalya was taken away

5

and refused to engage on the subject of his substance abuse history.  He responded only that he had tested negative four times since the case began (in actuality, he had only tested twice).  The Department's report states father was "reluctant and rude about talking to any social worker involved in his case.  He stated that he dislikes questions and does not have to answer any."

At the jurisdictional and dispositional hearing, the juvenile court found all four jurisdictional allegations true and therefore declared Natalya a dependent of the court under section 300.  It then proceeded to remove Natalya from both parents because return to their physical custody would create a substantial risk of detriment to her safety, protection, physical and emotional well-being.

Father timely appealed.

## DISCUSSION

### 1.    Justiciability

Father is not challenging the jurisdictional findings as against mother.  Accordingly, even if father were to prevail, the juvenile court would still have jurisdiction over Natalya pursuant to counts b-1, b-2, and b-4.  This is because " 'the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent.' " (*In re Briana V.* (2015) 236 Cal.App.4th 297, 308.)  Generally, an appeal of a jurisdictional finding is not justiciable under these circumstances.  (See *In re Madison S.* (2017) 15 Cal.App.5th 308, 329 [appeal from jurisdictional finding not justiciable where jurisdiction would be established regardless of the appellate court's conclusions with respect to challenged jurisdictional grounds].)

Nevertheless, father requests that we exercise our discretion to consider the merits of his appeal on the grounds set forth in *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763, which states that discretionary review is generally appropriate when the challenged finding "(1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citation]; or (3) could have other consequences for [the appellant], beyond jurisdiction." Following *In re D.P.* (2023) 14 Cal.5th 266, however, appeals of jurisdictional findings that serve as the basis for dispositional orders also challenged on appeal are no longer discretionary but mandatory. (*Id.* at p. 283 ["where a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot"].)

We therefore consider the merits of father's appeal.

## 2. Count b-2 Against Father Is Unchallenged and, in any Event, Supported by Substantial Evidence

Despite contending that "the petition, with all counts, should have been dismissed as to him in its entirety," father fails to so much as discuss the allegations that he "knew or reasonably should have known of the mother's substance abuse [during her pregnancy] and failed to take action to protect [Natalya]" and that this "failure to protect the child endangers [Natalya's] physical health and safety, creates a detrimental home environment and places [her] at risk of serious physical harm, damage, danger, and failure to protect."

Father only offers the general argument that "at the time of the jurisdiction hearing, there was no defined risk of harm to

7

Natalya from any actions of father." This simply ignores the juvenile court's express findings that his *inaction* in the face of mother's daily methamphetamine use while pregnant put Natalya at risk, and was in fact harmful to Natalya. Father's failure to address this finding against him forfeits his challenge to it.

Even if father had addressed the allegations of count b-2, we would still affirm the juvenile court's finding. We review the juvenile court's jurisdictional findings under section 300 for substantial evidence. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 184.) A father's knowledge of the mother's drug use and failure to take steps to prevent it is sufficient to support jurisdiction. (*In re J.C.* (2014) 233 Cal.App.4th 1, 6 ["Because there was sufficient evidence that father knew mother was taking drugs while she was pregnant and did nothing to protect his unborn child from her conduct, we affirm the juvenile court's jurisdictional order"].)

Here, there was substantial evidence that father knew of mother's history of methamphetamine use, including during her pregnancy. The juvenile court credited mother's statements at the hospital that she and father used methamphetamine together. It was free to disregard mother's later retraction, particularly in light of evidence that father was verbally and emotionally abusive to mother. As argued by counsel for Natalya at the jurisdictional and dispositional hearing, such evidence supports the inference that father influenced mother to recant the derogatory information about him to the Department. (See *People v. Cuevas* (1995) 12 Cal.4th 252, 277 [out-of-court statements later recanted in court were substantial evidence where there was reason to doubt sincerity of recantation].)

8

Further, although mother and father did not live together during the pregnancy, it is apparent they had significant contact. Mother reported often using methamphetamine two to three times per day, and that her use was triggered by constant fighting with father. Given the frequency of contact between the parents and the frequency of mother's related methamphetamine use, the trial court had ample basis to infer that father knew of mother's use while pregnant with Natalya.

Based on our conclusion that substantial evidence supports count b-2 against father, we decline to consider father's challenge to count b-3.

### 3. Count b-2 Is Sufficient to Support the Juvenile Court's Removal Order

We review the juvenile court's dispositional findings and order for substantial evidence, bearing in mind the heightened requirement of proof by clear and convincing evidence. (*In re V.L.* (2020) 54 Cal.App.5th 147, 154–155.) We must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996; see also *V.L.*, at pp. 154–155 [standard of review described in *Conservatorship of O.B.* applies to removal findings under § 361, subd. (c)].) Even in conducting this review, we still "must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, at p. 996.)

Substantial evidence supports removal. Father's indifference to mother's drug use during pregnancy evinces a lack

9

of concern for the safety and well-being of Natalya. He continues to avoid the topic of his own drug history, despite appearing "high" at Natalya's birth and prior referrals that included evidence of cocaine and methamphetamine use. He continues to minimize mother's struggles and deny knowledge of them, despite evidence he previously used with mother and that she used methamphetamine during her pregnancy because of father's treatment of her. Denial is a relevant factor to consider when determining risk to a child placed with the parent. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.)

Moreover, father told the Department he believed the only thing he needed to accomplish in the case was to find a larger home so he could live with mother, Natalya, and his other children, as a family. Mother also hopes to live with father and Natalya as a family. This desire, coupled with father's defiant attitude toward the Department throughout the case, creates the risk that father would give mother unlimited access to Natalya if she were placed with him. Even without regard to any drug use issues father has, creating a situation in which the parents could circumvent removal from mother in the early stages of her sobriety and place her and Natalya unsupervised with father— the trigger for mother's drug use—is also a danger to Natalya.

Father argues that Natalya could have been placed safely with him because he was also taking care of his 16-year-old twins. He also notes he was testing clean at the time of the jurisdictional and dispositional hearing. These facts do not negate the juvenile court's finding that staying with father would be dangerous in light of his indifference towards mother's prenatal drug use. Even if father's home was safe for older children, the juvenile court was free to conclude it was unsafe for

10

an infant.  Courts have long recognized younger children are more vulnerable to parental neglect.  (See *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 ["the absence of adequate supervision and care poses an inherent risk to the[] physical health and safety" of children of "tender years"].)

Substantial evidence supported removal of Natalya from both parents to ensure her welfare while her parents receive reunification services and can be more fully assessed by the Department and juvenile court.

## DISPOSITION

The juvenile court's orders exercising jurisdiction over Natalya and removing her from father's custody are affirmed.


GRIMES, J.

WE CONCUR:



STRATTON, P. J.



WILEY, J.

11