Filed 10/5/21  In re M.L. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.L. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E075641/E075959 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J280947 & J280948) |
| v. | OPINION |
| N.L. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. Erin K. Alexander, Judge. Affirmed.

William D. Caldwell, under appointment by the Court of Appeal for Defendant and Appellant, B.C.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento for Defendant and Appellant, N.L.

1

Michelle D. Blakemore, County Counsel and Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

When she was two months old, M.L. suffered several rib fractures while in the care of her parents, B.L (mother) and N.L. (father). At the jurisdiction and disposition hearings, the juvenile court declared M.L. and her sister dependents, removed them from their parents' custody, denied both parents reunification services, and set a permanency planning hearing. In a prior writ opinion, we rejected the parents' challenges to these orders.

In this appeal, the parents challenge the juvenile court's denial of their Welfare and Institutions Code section 388 petitions seeking reunification services and the court's decision to terminate their parental rights. They argue they established both a prima facie case for holding an evidentiary hearing on their petitions and that the parental benefit exception to terminating parental rights applies to them. We affirm.

# I

# FACTS

A.    *Jurisdiction and Disposition*

Mother and father are a young couple who were in their early twenties when their two-month-old daughter, M.L., suffered the injuries that brought her to the attention of the San Bernardino County Children and Family Services (the department). The juvenile court took jurisdiction over M.L. and her two-year-old sister, Me.L., on October 2, 2019, finding they were dependent children as described by Welfare and Institutions Code

2

section 300, subdivision (a) (serious physical harm), subdivision (b) (failure to protect), and subdivision (e) (severe physical abuse of child under five). (Unlabeled statutory citations refer to the Welf. & Inst. Code.)[1]

The evidence before the court at the time of the hearing was that M.L.'s injuries were discovered when mother took her to urgent care for a bump on her ear that she thought was a bug bite. The doctor who examined M.L. concluded the bump was a hematoma (a pooling of blood underneath the skin) and found additional injuries. Ultimately, several specialists at Loma Linda University Medical Center examined the infant, and the consensus was that, in addition to the hematoma, she had suffered several rib fractures in both sides of her ribcage, fractures in both wrists (in the distal ulnas), and fractures in both ankles (in the distal tibias). The doctors also agreed these injuries were inflicted nonaccidentally and the rib fractures were at two different stages of healing. They concluded the hematoma was caused by friction or shearing, the rib fractures by squeezing or crushing, and the wrist and ankle fractures by violent shaking or twisting of the limbs.

The parents said they didn't know how M.L. had sustained the injuries. Father worked as a mechanic and mother was the primary caretaker, though sometimes the maternal grandmother and paternal grandparents would also help care for the girls. When the hospital informed mother of the rib fractures, she accused them of lying. Then she

---

[1] The juvenile court also found that the older sister was a dependent child as described by section 300, subdivision (j) (abuse of sibling).

said M.L.'s sister could have been the one who hurt her because she was very strong for a two year old.

Over time mother provided other possible explanations for the injuries. She and the maternal grandmother suspected hospital staff had fractured M.L.'s ribs when she was being treated for jaundice a week after she was born, and they suspected outpatient staff had fractured M.L.'s ankle when they were treating her for a respiratory illness. Mother told the social worker that she remembered M.L. had fallen out of her swing in the past, too, but couldn't recall exactly when. In a later interview, father said M.L.'s sister had pulled her out of the swing, and when the social worker mentioned that mother had said M.L. had fallen out, mother accused the social worker of switching the story. The doctors at Loma Linda who examined M.L. agreed the injuries were not caused by medical treatment or by a two-year-old child.

At the jurisdiction hearing, the parents presented the testimony of a pediatric orthopedic surgeon who, having reviewed M.L.'s x-rays, concluded that a two-year-old child was capable of exerting the approximately 60 newtons of force necessary to cause the rib fractures. He also believed the wrist and ankle x-rays showed unusual morphology, not fractures. However, he did believe the rib fractures were the result of injury and not a genetic disorder like osteogenesis imperfecta. He also agreed that anyone who was caring for M.L. within the first five days of her rib fractures would realize she was hurt because her ribs would be very tender and she would exhibit discomfort when

touched. Additionally, father's counsel attempted to submit a polygraph test father had taken regarding M.L.'s injuries, but the court ruled it was inadmissible.

The court found the Loma Linda doctors' opinions more persuasive than the parents' expert's. However, with regard to section 300, subdivision (e) (severe physical abuse of child under five), which requires clear and convincing evidence rather than a preponderance, the court found sufficient evidence the rib fractures were the result of abuse but not the abnormalities in the wrists and ankles. The court also found the hematoma and rib fractures were the result of intentional abuse that the parents inflicted or at the very least knew about. The court concluded the parents should have noticed M.L. was hurt during everyday activities like bathing or diaper changes, and it found their various explanations for the injuries inconsistent and implausible.

At the disposition hearing on October 10, 2019, the court heard testimony from both parents as well as a psychologist they'd hired to evaluate their ability to protect their daughters. The psychologist's report, which the court accepted into evidence, "strong[ly]" recommended the parents be reunited with the girls "immediately." The psychologist had met with the parents after the court had taken jurisdiction over their daughters, reviewed the court-filed documents, and given the parents a battery of diagnostic tests. From these tests she concluded there was "nothing" to warrant any "concerns" about their parenting. She opined that reunification services would likely prevent future abuse or neglect.

This was the psychologist's first time testifying in dependency court, though she had performed about 10 psychological evaluations for dependency proceedings. She said father had not appeared deceptive during the evaluation and mother had provided good suggestions for how to keep M.L. safe, like keeping the baby in her eyesight and refusing to let anyone hold, squeeze, or "cuddle" her. The psychologist believed that, going forward, mother would be more protective, even from father, "almost like a mama bear."

Father said he accepted the court's jurisdictional findings. He denied injuring his daughter but said it was "possible" mother or his parents had. He was willing to take M.L. away from them if it turned out they had injured her. When asked how he would protect M.L. going forward, he said he would keep his two-year-old daughter away from her, and watch his family members when they were around. He said M.L. might have been injured when her sister was interacting with her "too forcefully." Mother said she also accepted the court's jurisdictional findings and was willing to do anything to protect her daughters, including separating from father or other family members.

The court found the psychologist's and the parents' testimony concerning, and afforded the psychologist's opinion little weight because she did not appear competent in juvenile law and had demonstrated a "complete lack of understanding" of the jurisdictional findings. "I was alarmed that the doctor seemed to think that prevention" of abuse could be achieved by not letting family members cuddle M.L.—"[t]hese injuries did not occur from cuddling." The court was also disturbed by the fact that neither parent seemed to accept responsibility for their daughter having been the victim of severe abuse

6

nor had they been able to explain why they hadn't noticed the injuries. The court noted they were almost six months into the proceeding and the parents were in the same position as when the case started, with no explanation as to what happened to M.L.

The court found the parents had presented no evidence to indicate how services could prevent future abuse and injury. As a result, it removed M.L. and her sister from the parents' custody, bypassed reunification services under section 361.5, subdivisions (b)(5) and (b)(7), and set a permanency planning hearing. In December 2019, we issued an opinion denying the parents' writ petitions challenging these orders. (*N.L. v. Superior Court of San Bernardino County* (Dec. 31, 2019, No. E073900) [2019 WL 7343244].)

B.     *Placement with the Maternal Great Aunt*

The girls were placed with their maternal great aunt on July 5, 2019. By all accounts, they had no issues adjusting to their new placement because they had known the great aunt since birth. The girls were comfortable and happy in her care, and the great aunt saw them as her own children, loved them very much, and wanted to adopt them. Both girls were healthy, developmentally on track, and had normal temperaments for children their age. They generally ate and slept well, with the exception that the older sister had nightmares and separation anxiety on occasion (but the department's report does not indicate the object of the child's separation anxiety, that is, whether it was caused by being away from her parents or by, for example, being separated from the great aunt at bedtime). The great aunt was taking the sister to mental health services once a week to help with these issues.

The great aunt had raised four children of her own who were now adults. She said she would foster and maintain family relationships with the maternal and paternal relatives as long as they behaved appropriately and acknowledged M.L. had been the victim of abuse.

In March 2020, the department filed an addendum report notifying the court of inappropriate behavior on the part of the parents. The great aunt had been allowing them to attend M.L.'s medical appointments because she believed she was legally required to as their parental rights had not been terminated. According to hospital staff, the parents and the maternal grandmother were asking for genetic, orthopedic, and allergist referrals because they wanted to do their own research about the cause of M.L.'s injuries. At one point, mother became very upset because she wanted the referrals sent to a specific hospital she preferred and said she'd pay cash if needed. A nurse practitioner who worked at the hospital told the social worker the parents had also been calling and harassing their telephone coordinator for the referrals.

The department attached to the addendum report a letter the maternal grandmother had faxed the hospital on February 25, 2020 requesting referrals. The letter said she was M.L.'s grandmother and the infant had "suffered injuries that can only be explained by medical specialists." She continued, "we are racing against the clock. I need a referral to a geneticist and also an allergist. If I don't get these exams done in time the county will decide the entire course of my daughter's family's lives."

The social worker told the great aunt that the family's conduct was improper and she shouldn't allow them to attend M.L.'s medical appointments anymore. The great aunt said she had no problem abiding by this rule. She also said she no longer wanted anything to do with the parents, the maternal grandmother, or anyone else who didn't believe M.L. had been the victim of abuse, and she was willing to file a restraining order against the parents if needed.

C.    *The Section 388 Petitions*

On February 4, 2020, mother filed a section 388 petition seeking reunification services. As new evidence since removal, she said her and father had scheduled further appointments for M.L. with a "geneticist and an allergist who need further testing" and that M.L. had "pending appointments [with] an orthopedic and endocrinologist." She also said she and father were "taking advantage of every parenting, child abuse prevention, and counseling available to . . . protect our daughters while providing a safe loving and nurturing environment for them." However, she didn't include any documentation or specifics about any services she was participating in.

On May 29, 2020, father filed a section 388 petition requesting reunification services. He said he had "gone above and beyond the requirements established by the [department] and this Court" by completing additional counseling and a 12-week child abuse program. He said he'd "worked very hard on issues, parental responsibilities, boundary setting, coping skills, and communication skills" and had "made substantial positive progress in my growth as a person and a parent." He attached documentary

9

evidence of his therapy sessions as well as a certificate of completion for the child abuse course. He also attached the polygraph report the juvenile court had excluded at the jurisdiction hearing. The examination was administered by WestCoast Polygraph & Associates, and they found father to be truthful when he denied injuring M.L. The polygraph report noted that during pre-examination disclosures, father told them M.L. had been born with jaundice and respiratory problems and he believed "her constant coughing might have caused the fracturing to her ribs."

The court summarily denied both parents' petitions, concluding they had failed to sufficiently allege changed circumstances warranting reunification services and how services would be in the girls' best interests.

On September 8, 2020, mother filed a request for reconsideration of her petition. Her request said she "now acknowledges the existence of injuries relating to the abuse" and is "in the process of developing coping skills to assist her." In her accompanying declaration, she said she had "previously enrolled into every class and completed them in hopes that the insight gained would help me to understand, acknowledge and remediate my errors." She acknowledged those abuse-caused injuries had occurred while she was responsible for the child and realized "[f]or that I remain responsible." As with her initial petition, she did not provide information about the services she had attended or proof of attendance. The court denied mother's request.

D.    *Termination of Parental Rights*

The girls' permanency planning hearing took place on October 20, 2020. The department recommended termination of parental rights and adoption. They believed the great aunt could provide the girls with a safe, stable, and loving environment and that the girls were bonded to her.

Father called the social worker as a witness to testify about the nature of his visits with his daughters. She said the visits were positive, father was always appropriate and affectionate, and he never missed one. The girls would hug and kiss him, M.L.'s sister called him "daddy," and M.L. alternated between calling him "dad" and "mom."

At the close of this testimony, father's counsel argued the parental benefit exception applied to father. Mother's counsel did not argue the parental benefit exception applied but "merely asked the Court not to proceed with [termination of parental rights] at this time and perhaps allow my client additional time to attempt adequate reunification."

The court found the parental benefit exception did not apply to either parent. It found that despite maintaining consistent, positive visits with the girls, the parents had not occupied a parental role in their daughters' lives since removal, and there was no evidence the girls would suffer detriment if adopted. "We're . . . talking about very young children, for [the older sister adoption] would be 15-plus years of permanency, for [M.L.] that would be 17-plus years of permanency. So in balancing I find that their right to permanency far outweighs any existential detriment that would exist from the pleasant

11

visits [with the parents]." The court terminated mother's and father's parental rights, found the girls adoptable, and selected adoption as their permanent plan.

## II

## ANALYSIS

A.    *The Section 388 Petitions*

The parents argue the court erred by summarily denying their petitions because they established a prima facie case that their circumstances had changed, which required the court to hold an evidentiary hearing. (§ 388, subd. (d).) We disagree.

A juvenile court may modify or set aside a dependency order under section 388 if the petitioner establishes by a preponderance of the evidence (i) a legitimate change of circumstances and (ii) that undoing the prior order would be in the best interest of the child. (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.) The petitioner must show that the relevant circumstances have in fact *changed*, not merely that they are in the process of changing. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

To obtain an evidentiary hearing, the petitioner must allege facts sufficient to demonstrate a prima facie case for the modification they seek. (§ 388, subd. (d); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310.) A petitioner demonstrates a prima facie case for relief when the allegations in their petition, when liberally construed, support a

finding of both changed circumstances and best interests of the child. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431-432.)[2]

We review the denial of a section 388 petition for abuse of discretion and will not overturn the juvenile court's decision unless the appellant shows it to be arbitrary, capricious, or patently absurd. (*In re S.J.*, *supra*, 167 Cal.App.4th at pp. 959-960.)

Here, the juvenile court's conclusion that the parents failed to sufficiently allege changed circumstances falls well within the bounds of reason. As the court pointed out, since removal nothing relevant about the parents' situation had changed. They were still together, they still depended on the same family members for support, and, most importantly, they were still in denial (at best) or defensive (at worst) about the cause of M.L.'s injuries. This is clear from the fact that, months after the jurisdictional findings of abuse, they were still trying to find explanations for M.L.'s injuries that didn't involve nonaccidential injury.

The parents argue that the juvenile court placed them in an impossible situation, a confession dilemma, by essentially requiring them to admit to abusing their child for the court to consider giving them reunification services, when a confession would also provide the very basis for denying services. But that was not the concern the juvenile

---

**2** Father argues the juvenile court failed to apply this liberal pleading standard when assessing the sufficiency of his petition. He is wrong. The court explicitly stated, "I have read [father's] petition . . . and I don't find that it meets even the liberally construed prima facie standard to set a hearing." It noted that if father's petition "went to a hearing there would be a higher standard of [proof because] this was a no services case to begin with," but said it was, at the prima facie stage, "treating [father's petition] as any other 388."

court had about the parents' ability to safely care for their daughters. The court found that M.L. had been abused but acknowledged that the abuser's identity was unknown. Assuming the parents had not inflicted the abuse, their failure, then, was not in abusing the child but in *recognizing* she was injured and *protecting* her from further harm—and not just once, but on at least two separate occasions. The juvenile court told the parents how they could be more protective at the disposition hearing and it wasn't confessing to the abuse. It was by demonstrating how they would ensure a protective child care environment that, for example, didn't involve those caring for the child when she was abused. Nearly a year later, the parents still hadn't shown how they could be protective. (See, e.g., *In re Madison S*. (2017) 15 Cal.App.5th 308, 327 ["services for father might have been appropriate without an . . . admission of guilt . . . , if, for example, mother was willing to take affirmative steps to keep the child safe and/or both parents agreed [the child] was a victim of abuse and should be treated as such" but "neither parent was even willing to acknowledge that nonaccidental injury occurred, conduct amounting to 'a willful denial of the injuries themselves'"].)

Next, the parents point to their voluntary participation in services after removal as proof they sufficiently alleged changed circumstances.[3] Though father's petition

---

[3] Father argues the juvenile court found he did demonstrate changed circumstances but failed to demonstrate reunification was in the girls' best interests. This mischaracterizes the record. The court concluded father failed to sufficiently allege facts to permit it to "find either a change in circumstances or best interest." But even if the court had found father sufficiently alleged changed circumstances, "we review the lower court's ruling, not its reasoning [and] we may affirm that ruling if it was correct on any ground." (*In re Natasha A*. (1996) 42 Cal.App.4th 28, 38.)

contained more detail and documentation, both parents alleged engaging in the same type of services—counseling and parenting classes—and obtaining essentially the same type of insights—they can now accept M.L. was "injured" in their care and now have the communication, boundary-setting, and coping skills to provide a "loving" home. These allegations demonstrate a failure to grasp the seriousness of a section 300, subdivision (e) jurisdictional finding. When a parent fails to notice their infant daughter has been not injured but *abused* in their care on two occasions, their parenting issue is failure to protect, not poor communication or boundary setting.

This is not a case of drug abuse, domestic violence, or neglect, where the parent can reduce the risk they pose to their child by learning about their issues and working to treat them. This is a case where a child was severely physically abused on multiple occasions and the parents failed to notice. That type of issue is not one that can be treated by attending individual counseling sessions or a 12-week child abuse program. The change in circumstances required in this context must be substantial and, crucially, *related to the risk the parents pose*. (*In re Heraclio A.* (1996) 42 Cal.App.4th 569, 577.)

But even if the parents had alleged facts demonstrating a legitimate change in circumstance, the court could reasonably conclude that reunification services would not be in the girls' best interests at this point. Once reunification services are denied or terminated, the focus shifts from keeping the family together "'to the needs of the child for permanency and stability.'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) When the court denied the petitions, the girls had been out of the parent's care for over a year. This

15

means M.L. has spent almost her entire young life in her great aunt's care, and her sister almost half her life. The girls have known the great aunt since birth; they immediately bonded with her and are happy and healthy in her care. Granting a section 388 petition would delay selection of a permanent home for these very young children and not serve their best interests. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) Summary denial of the petitions was proper.[4]

### B.     *The Parental Benefit Exception*

The parents also argue the court erred in finding the parental benefit exception did not apply.

"'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family." (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) And, as we've just seen, when a dependency reaches this stage, the focus shifts from keeping the family together to the children's need for permanency and stability. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 ["By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount"].) "[I]t is only in an extraordinary case that

---

[4] Because we find no error in the court's summary denial, we do not address mother's argument that she was prejudiced by not being able to testify about certain details lacking from her petition, like "the *quality* of [her] visits" with her daughters. (Italics added.)

16

preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Id*. at p. 1350.)

The statutory parental benefit exception applies when (i) the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and (ii) the court finds that the parent-child relationship presents a "*compelling reason* for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B)(i), italics added.)

Recently, our Supreme Court provided guidance on how we should apply this exception. (*In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).) "The language of this exception, along with its history and place in the larger dependency scheme, show that [it] applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Id.* at p. 630.)

Our high court indicated we should continue to be guided in our understanding of these elements by one of the foundational appellate court opinions discussing the parental benefit exception, *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*), which emphasized that in "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (See *Autumn H.*, at p. 575.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits

17

of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. (*Ibid.*) That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

Under *Caden C.*, that is the end of the analysis. Some appellate courts have interpreted the exception to require some *additional* compelling reason for its application, but our Supreme Court made clear that's no longer permitted. The only compelling reason required for the exception to apply is when the parent-child relationship is *so significant* it *outweighs* the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 632-633, 642.)

"What this means is that the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that

18

attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

*Caden C.* also resolved a conflict over the standard of review in such cases. The substantial evidence standard applies to the court's finding on the frequency of contact and the existence of a beneficial relationship. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) And the abuse of discretion standard applies to the court's decision whether terminating parental rights would be detrimental to the child so as to outweigh the permanency benefits of adoption. (*Id.* at pp. 640-641.)

Here, it's undisputed the parents maintained consistent and positive contact with their daughters. The only question we face is whether they demonstrated they shared such a substantial, positive emotional attachment with their daughters that the harm of severing the parent-child relationship outweighed the benefit of stability in adoption. On this point, the parents have not shown the exception applies. The parents are not wrong that the record shows their visits went well and the girls enjoyed being with them. But such evidence falls short of establishing their relationships with their daughters were positive and substantial enough to outweigh the permanency benefits of adoption. This is because the girls also exhibited a strong relationship with their current caretaker, the maternal great aunt. Both girls were very young when they were removed from the

parents' home and placed with their great aunt, whom they had known since birth. Now, after almost a year and a half, they are bonded to her and look to her to have their needs met. And she has been taking good care of them; there have been no injuries since they were placed in her care.

Mother argues there is evidence M.L.'s older sister will suffer great harm if adopted because she had nightmares in the great aunt's care and would cry at the end of visits. But we do not find this compelling enough to forgo adoption. Nightmares are a relatively minor and common issue with very young children (and there is no reason to think the sister's nightmares are linked to being out of mother's care). It is also common for a young child to be sad at the end of a positive and loving visit with their parent. But courts have repeatedly found that such visits are not a sufficient reason to deprive a child of the stability benefits of adoption. (See, e.g., *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316 [no exception where "[a]t best, mother's supervised interactions with [her daughter] amounted to little more than playdates for [her] with a loving adult"].) Because the girls are so young, bonded to their current caretaker, and doing well in her home, there is no evidence that the harm in severing mother's and father's parental rights outweighs the permanency benefits they will gain through adoption.

### III

### DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


SLOUGH
J.


We concur:


CODRINGTON
Acting P. J.


FIELDS
J.


21