Filed 6/21/24  In re E.L. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re E.L. et al., Persons Coming Under the Juvenile Court Law. | B331243 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>H.L., Sr.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 18CCJP05419F, 18CCJP05419G, 18CCJP05419H, 18CCJP05419I, 18CCJP05419J |

APPEAL from orders of the Superior Court of Los Angeles County, Tiana J. Murillo, Judge.  Dismissed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

————————————

Father appeals from the juvenile court's jurisdictional and dispositional findings and orders relating to his five children. The court declared the children dependents of the juvenile court under section 300 of the Welfare and Institutions Code[1] based on father's and mother's conduct and removed them from parents' custody. Father contends substantial evidence did not support the court's jurisdictional findings based on his history of substance abuse, and there was insufficient evidence to justify removing the children from his custody. Mother is not a party to this appeal.

While this appeal was pending, the juvenile court returned the children to father's custody. Father's appeal is moot. The children would remain dependents of the juvenile court even if we were to reverse the jurisdictional findings against father, and there is no effective relief we can provide him now that the court has placed the children in his custody. Father nevertheless asks us to exercise our discretion to consider the merits of his appeal. We decline to do so and dismiss his appeal as moot.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

Father has five children with mother: E.L. (born October 2010), Jay.L. (born April 2012), H.L. (born September 2013), Z.L. (born May 2015), and Jas.L. (born August 2018).

**1.** ***Past dependency petition***

In December 2018, the juvenile court sustained a section 300 petition on behalf of the children based on parents' domestic

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     We include facts relating to mother only as necessary for background and to our analysis.

violence in the children's presence; father's creation of a detrimental home environment in having had ammunition, methamphetamine, marijuana, and knives in areas accessible to the children; and father's "unresolved history of substance abuse," including with methamphetamine.

In November 2020, the juvenile court terminated jurisdiction and issued a juvenile custody order granting mother sole legal and physical custody of the children and father monitored visitation three times a week for three hours each visit. Father's visitation was monitored due to his failure to complete court-ordered programs: a drug abuse treatment program with random drug testing, a domestic violence program for offenders, a parenting course, and individual counseling.

## 2. *Current dependency petition*

The Los Angeles County Department of Children and Family Services (DCFS) again became involved with the family in early April 2023 when it received a report about mother's neglect of the children. According to the reporting party, mother was homeless—staying at different motels with the children—and had a history of using "crystal meth" daily. She was leaving the children unattended; they sometimes would go a day without eating. The children had said mother had hit E.L. and Jay.L. with a wire and asked E.L. to hold her drug paraphernalia.

About three weeks earlier, paternal great-aunt had picked the children up from a motel and brought them to her house to care for them.[3] E.L. had called her because the children were

---

[3]    Jay.L., however, had been staying with maternal aunt for the past two months, not paternal great-aunt.

3

hungry.  At the time, father was living with paternal great-aunt and was enrolled in domestic violence classes.  He had been released from jail in October 2022.

After receiving the report, DCFS contacted paternal great-aunt.  She told the social worker the children weren't attending school and hadn't seen a doctor in months.  They felt unsafe with mother and did not want to return to her care.  Paternal great-aunt said father had been living with her before the children had arrived.  She was willing to ask father to leave so the children could remain in her home.[4]

DCFS interviewed the children about mother and father.  They had seen mother use drugs.  They described mother smoking in the bathroom all day, sometimes with friends.  She left pipes and "bongs" out in the bathroom.  Mother also left the children alone in the motel room all day, leaving E.L. in charge.  Mother hit the children, sometimes leaving marks and bruises.  Jay.L. said the children sometimes called father when they had not eaten.  He would bring them food.

Jay.L. said father "used to use drugs too but not anymore."  He was "doing a lot better now" and worked at UPS.  E.L. also said father was working for UPS and had given paternal great-aunt money to buy the children school clothes and food.  She and H.L. said father lived in the home, spent time with them there, and "was nice to them."  E.L. and H.L. denied having seen father use drugs while in paternal great-aunt's home.  E.L. said he was "doing a lot better now" and stated, " 'I love my dad.' "

---

[4]     Paternal great-aunt's husband, paternal grandmother, paternal uncles, and paternal aunt—as well as father—also lived in the home.

4

Father told the social worker he was aware of mother's and the children's living situation. He said the children had called paternal great-aunt several times when mother had not paid the motel, leaving them with nowhere to stay. On those occasions, he gave money to paternal great-aunt to pay the motel for a few more days. When asked why he personally hadn't done anything to protect the children, father said he didn't want to have any direct contact with mother given their history. He denied ever witnessing mother use drugs but thought she was using methamphetamine.

Father admitted he used to use methamphetamine but said he had been sober since his release from jail on October 5, 2022, for possessing a firearm. He was on probation. He said he regularly checked in with his probation officer and drug tested. Father submitted to a drug test for DCFS, and the results were negative for all substances. After his release from jail, father was advised to enroll in individual counseling, domestic violence classes, and substance abuse services. He had enrolled in domestic violence classes but said he didn't have the resources to enroll in the other services. Father was willing to move out of paternal great-aunt's home so the children could remain there.

On April 13, 2023, DCFS obtained a removal order authorizing the children's detention from parents. All five children were placed in paternal great-aunt's home. Father immediately moved out.

On April 17, 2023, DCFS filed a section 300 petition on behalf of the children based on (1) mother's substance abuse, her physical abuse and neglect of the children, and her emotional abuse and medical neglect of Z.L., whose ADHD diagnosis mother had failed to treat; and (2) father's substance abuse. The petition

alleged father "has a history and is a current abuser of methamphetamine which renders [him] incapable of providing regular care and supervision of the children"; due to her young age, Jas.L. required "constant care and supervision and . . . father's substance abuse interferes with providing regular care and supervision of the child"; and the children were former dependents of the juvenile court due to father's substance abuse.[5]

At the initial hearing the next day, the juvenile court ordered the children detained from parents and that parents' visitation be monitored.

### 3. *Pre-adjudication reports*

DCFS filed its jurisdiction/disposition report on May 19, 2023 and an interim review report on June 1, 2023. Father's criminal history included arrests and/or citations from October 2015 to July 2022 for spousal battery, infliction of corporal injury on a spouse, possession of a controlled substance and possession of a controlled substance for sale, violation of court orders, and robbery.[6] An April 25, 2023 letter from father's probation officer stated father had been convicted on October 5, 2022 for vehicle theft and possession of a firearm.[7] Father's probation did not include drug testing terms, but father had tested once

---

[5] DCFS filed an amended petition alleging additional counts against mother. It asked the court to dismiss the counts relating to Z.L.'s diagnosis.

[6] Father's most recent arrest or citation for possession of a controlled substance was in April 2021.

[7] Father was released with time served.

on November 15, 2022, with negative results. Father was in compliance with his probation terms.

The jurisdiction report stated father "reported having abused methamphetamine as early as October 2022." In his DCFS interview after that report was filed, however, father stated it had been more than a year and a half since he last had used methamphetamine. Father clarified October 2022 was when he was released from jail—in other words, he had not resumed using methamphetamine after his release. Father stated he began using methamphetamine when he was about 20 years old and marijuana when he was 11 years old. He also had become active in a gang at a young age. Father acknowledged the earlier domestic violence with mother.

Father was not participating in a substance abuse treatment program. He said he had stayed sober "with the support of his girlfriend and the motivation of reunifying with the children." Father submitted to one drug test in April 2023 and four in May 2023. Each test was negative for all substances.

Father knew mother had smoked marijuana in the past but said he had had no reason to believe mother was using drugs. He had had little contact with her after his release in October 2022. Father said he would have been able to tell if mother were abusing drugs based on his past abuse of methamphetamine and marijuana. He also told DCFS he did not know mother had been physically abusing the children. The children never told him about the abuse or that they feared mother. When the children called him for food or money, he dropped it off with E.L. outside the motel. He also had paternal grandmother bring the children what they needed. In the past, mother had been appropriate with the children. He said that, because he believed mother

"was a good mother[,] he never 'stepped up' to be more active in the children's lives." He would visit the children when they were at paternal grandmother's home or during family gatherings.

As for the allegations against mother, the children consistently stated mother used drugs in their presence, hit and yelled at them, and neglected them. They feared mother and did not feel safe with her. Mother denied the allegations.

The older children discussed father's substance abuse with DCFS. E.L. knew father had used marijuana and methamphetamine in the past, as she had seen the drugs and drug paraphernalia in their home. E.L. also was aware father had served jail time due to drug charges during the earlier dependency case. Jay.L. and H.L. similarly were aware of father's past drug use.

All three children stated father currently was not abusing drugs. E.L. said she knew father was sober because he visited them consistently, was emotionally present during visits, and had tested for DCFS. Jay.L. said father did not have any drugs or paraphernalia with him on visits. She didn't believe father would visit them on Saturdays and Sundays if he were abusing drugs. H.L. also mentioned father's visits—that he was "awake" and played with the children and brought food so they could have a meal together.

Father reported regularly visiting the children at paternal great-aunt's home. He hoped to have longer visits, or to move into the home, to help paternal great-aunt with the children. Paternal great-aunt monitored father's visits and said they were appropriate. Paternal great-aunt said she had asked father to make himself available for longer visits or to visit on more days.

DCFS concluded it currently was unsafe to release the children to mother or father. DCFS did not believe the children's safety and well-being could be ensured without court intervention. It again noted father had reported using methamphetamine as early as October 2022. It also noted father's failure to reunify with the children in the previous matter and that he had failed to protect the children from mother "even after having suspicion of . . . mother's substance abuse." DCFS recommended the children be declared dependents and parents receive family reunification services.

The originally-scheduled June 6, 2023 adjudication hearing was continued to July 18, 2023. In its interim report filed before the continued hearing, DCFS explained Jay.L. had been hospitalized in May 2023 after attempting to hang herself with an electrical cord and other self-harm. She identified "family dynamics and unresolved anger and resentment with dad" as "[t]riggers."

DCFS also noted father had tested negative for all substances on June 1, 6, and 14, 2023. He tested positive for marijuana, however, on June 21 and 26, and July 6, 2023. Father admitted he had resumed smoking marijuana to address a toothache. He did not see it as an issue because he did not smoke in the presence of the children and did not visit them while under the influence of marijuana.

By July 2023, father had attended 14 of 52 sessions of his domestic violence program and had missed two sessions. He also had enrolled in a parenting course and had attended four of 10 sessions.

**4.** *Combined adjudication and disposition hearing*

Father submitted written stipulated testimony for the combined adjudication and disposition hearing signed by all counsel. If called, he would testify that, when he told the social worker he had been sober from methamphetamine since his release from jail on October 5, 2022, he meant that he had not "used at all" since his release. He did not mean that he had used on that date and never said he had used methamphetamine on that date. He did not use methamphetamine while he was incarcerated or after his October 2022 release. As of July 2023, he had not used methamphetamine "for about two years" and had not been cited or charged with any drug-related offenses "in over two years." The juvenile court accepted father's stipulated testimony, took judicial notice of the case file, and admitted into evidence DCFS's, father's, and mother's exhibits.

Counsel for father asked the court to dismiss the allegations against father, arguing there was insufficient evidence of a current risk of harm to the children based on his past methamphetamine use. Counsel argued father had not used methamphetamine since his release from jail and voluntarily had drug tested for DCFS with all negative results for methamphetamine. Father admitted to using marijuana, but counsel argued he had not cared for the children while under the influence or used it in their presence. Counsel also noted paternal great-aunt had declared she smelled marijuana on father only once during the six months that he lived in the home. Counsel argued DCFS had presented no evidence aside from father's "historical use of methamphetamine," and had not demonstrated a nexus between that past use and a current risk of harm to the children.

10

The children's counsel noted father had not completed a drug treatment program and currently was testing positive for marijuana use, which would be considered a "mind-altering substance" in a drug treatment program. She argued father therefore still was not sober and noted Jas.L. was very young, at only four years old. Counsel argued those facts, coupled with father's history of methamphetamine use and "lack of programs, creates a nexus." DCFS's counsel joined the children's counsel, arguing the risk of harm was not "just" based on father's past drug use, but the fact he had never completed a substance abuse program and now was testing positive for marijuana.

The juvenile court sustained the counts against mother except for those alleging she medically neglected and emotionally abused Z.L. The court sustained the two identical counts alleged against father under section 300, subdivisions (b) and (j), amending them to state he was a " 'recent abuser of methamphetamine,' " rather than a "current abuser." The court noted there was no evidence father had ameliorated his methamphetamine abuse issues—he had not completed a program or complied with the prior court orders. The court commended father for his negative drug tests, but noted his positive tests for marijuana. The court found that, given the court's prior sustained petition as to father, the lack of evidence that father had addressed those issues, and the ages of the children, a current risk of harm to the children existed, "until [the court could] see some addressing of the issues with [father]." The juvenile court found the children were described under section 300 and declared them dependents of the court.

As to disposition, father's counsel asked that father's visitation be unmonitored and that he have two, unmonitored,

11

overnight visits with the children in paternal great-aunt's home per week. The children's counsel joined in father's request for unmonitored overnight visits, stating the children and paternal great-aunt said father's visits had been consistent and appropriate. Counsel noted the children would like to return to father's care, but that was not the current request, and she "wouldn't have been in agreement with that." Counsel for DCFS objected to overnight visitation at that time, stating it would be premature.

The court found by clear and convincing evidence that the children could not safely be released to either parent's custody until the court saw "remediation of some of these issues." The court removed the children from parents' custody and ordered them suitably placed. The court ordered that father have unmonitored visits with the children, as well as two overnight visits a week in paternal great-aunt's home, and gave DCFS discretion to liberalize. The court ordered father to participate in random and on-demand drug testing, a 12-step program, and substance abuse counseling alongside individual counseling to address child safety and other case-related issues.

**5.** *Post-appeal developments*

On January 16, 2024, before father filed his opening brief, the juvenile court terminated its suitable placement order for the children and ordered the children placed in father's custody. With its respondent's brief, DCFS filed a motion asking us to take judicial notice, or accept as additional evidence, the court's January 16, 2024 minute orders. We granted the unopposed motion on March 12, 2024.

12

**DISCUSSION**

### 1.    *Father's appeal is moot*

"[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*In re N.S.* (2016) 245 Cal.App.4th 53, 60, quoted by *In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).) "[R]elief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.' " (*D.P.*, at p. 277.)

An appeal may be rendered moot where "jurisdictional findings have been made as to both parents but only one parent brings a challenge." (*D.P., supra*, 14 Cal.5th at p. 283.) Father's appeal does not challenge the jurisdictional findings against mother and she has not appealed the court's order. Thus, even if we were to reverse the jurisdictional findings against father, the juvenile court would continue to have jurisdiction over the children. (*Ibid.* ["[T]he principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation], means that ' "[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate." ' "].) An appeal is not moot, however, where the jurisdictional finding against the appealing parent " 'serves as the basis for dispositional orders that are also challenged on appeal.' " (*Ibid.*)

Here, father also challenges the court's disposition order removing his children from his custody. He contends substantial evidence did not support the removal order and, as the court's jurisdictional findings against him formed the basis of the order, his challenge of those findings is justiciable. Nevertheless, as the children have been placed in father's custody, the removal order no longer adversely affects his custody rights. Accordingly, there

13

is no effective relief we could grant father, even if we were to agree the court's findings on which the order was based lacked sufficient evidence. (*D.P., supra*, 14 Cal.5th at p. 276 [for relief to be " 'effective' " parent must complain of ongoing harm "capable of being rectified by the outcome" the parent seeks].) Similarly, father's complaint of the jurisdictional findings' stigma is "insufficient to sustain" his appeal, as any stigma from those findings no longer affects father's legal status in a way that we can redress due to the court's termination of its suitable placement order and entry of its home of father order. (*Id.* at p. 277.) Father's appeal therefore is moot.

**2.      *We decline to exercise our discretion to review the merits of father's appeal***

"Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P., supra*, 14 Cal.5th at p. 282.) Generally, that discretion is exercised "when 'the case presents an issue of broad public interest that is likely to recur,' 'when there may be a recurrence of the controversy between the parties,' or 'when a material question remains for the court's determination.' " (*Ibid.*) Father's appeal presents none of these circumstances.

Recently, our high court identified a non-exhaustive list of factors for assessing whether a court should exercise discretionary review of a moot appeal in a dependency proceeding. (*D.P., supra*, 14 Cal.5th at p. 286.) Courts may consider (1) "whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' ' "could have other consequences for [the appellant], beyond jurisdiction" ' "; (2) "whether the jurisdictional finding is based on particularly

14

pernicious or stigmatizing conduct"; and (3) "why the appeal became moot." (*Id.* at pp. 285–286.) Although, "no single factor is necessarily dispositive of whether a court should exercise discretionary review of a moot appeal," a court ultimately "should be guided by the overarching goals of the dependency system" in deciding whether to exercise that discretion on a case-by-case basis. (*Id.* at pp. 286–287.)

Father asks us to exercise our discretionary review to reach the merits of his appeal. He contends discretionary review is appropriate because (1) the court's jurisdiction findings based on his history of substance abuse, and disposition findings that his conduct endangered the children, stigmatize father as an " 'offending parent' " and "chronic substance abuser" and will prejudice him in any future dependency and family court proceedings; (2) his " 'laudable behavior'—substantial progress 'toward alleviating or mitigating the causes necessitating placement'—arguably rendered" his appeal moot; and (3) dismissal essentially would insulate the " 'erroneous' " jurisdictional and dispositional findings from review. (Quoting *D.P., supra*, 14 Cal.5th at pp. 285–286.)

Father argues DCFS's reliance on the 2018 sustained petition to support the court's findings in this proceeding demonstrates how the current findings similarly could prejudice him in future proceedings. His claim of future prejudice is nevertheless speculative. Even if we were to reverse the jurisdictional and dispositional findings, a court in a future dependency or family court proceeding still could consider the historical facts and circumstances on which the current petition and removal order were based, along with father's earlier case with DCFS and the juvenile court. (See, e.g., *In re Madison S.*

15

(2017) 15 Cal.App.5th 308, 330 [allegation comprising challenged jurisdictional finding "would almost certainly be available in any future dependency or family court proceeding, regardless of any determination on our part as to whether it formed an independent basis for juvenile court jurisdiction"].) Moreover, based on the 2020 juvenile court custody order, father was noncustodial when the current proceedings began. Mother had both physical and legal custody of the children, and father was limited to monitored visitation due to his failure to complete his court-ordered programs. That custody order would be available in any future proceeding involving the children. (Evid. Code, § 452, subds. (c) & (d).) Of course, in any such future proceeding, father would have an equal opportunity to present the court's orders in this matter to show the court awarded him unmonitored and overnight visitation and—after finding he had made substantial progress—ultimately placed the children in his custody.

Nor do we find the jurisdictional and dispositional findings against father were based "on particularly pernicious or stigmatizing conduct" so as to raise a concern over not insulating erroneous and stigmatizing jurisdiction findings from review to warrant exercise of our discretion to reach the merits. (*D.P., supra*, 14 Cal.5th at pp. 285–286 ["The more egregious the findings against the parent, the greater the parent's interest in challenging such findings."].) And, although we commend father for making substantial progress to ameliorate or mitigate the case issues that led the court to terminate its suitable placement order and place the children with him, "no single factor is

16

necessarily dispositive of whether a court should exercise discretionary review of a moot appeal." (*Id*. at p. 286.)[8]

On balance, after considering all the pertinent factors and the totality of the evidence in the record, we conclude discretionary review of father's moot appeal is not warranted.

## DISPOSITION

The appeal is dismissed as moot.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

ADAMS, J.

_____

[8] Father may have forfeited his challenge of the removal order in any event. Although he asked for the children to be placed with him at the initial hearing, father did not ask for custody at disposition. His counsel asked for overnight and unmonitored visits, which is what the court ordered.