Filed 2/27/25  In re K.N. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re K.N., a Person Coming Under the Juvenile Court Law. | B333489 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.B.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 23CCJP02725A) |

APPEAL from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

K.B. (mother) appeals from jurisdictional findings and dispositional orders after the juvenile court asserted jurisdiction pursuant to Welfare and Institutions Code[1] section 300, subdivision (b)(1) over her then 14-year-old daughter, K.N. (born September 2008) and removed her from mother's care. Mother contends the juvenile court erred when it found she was unable to curtail K.N.'s increasing acts of misbehavior, including running away from home and criminal activity that placed the teen at substantial risk of serious physical harm. Mother does not challenge the court's dispositional orders on independent grounds. Rather, she asserts only that because there is insufficient evidence to support the jurisdictional findings, the dispositional orders also fail. We conclude otherwise and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*A. The Family's Prior History of Referrals*

The family has a lengthy history with respondent Los Angeles County Department of Children and Family Services (DCFS). In 2011, DCFS investigated a referral alleging emotional abuse of K.N. (who was aged 3 at the time) after mother was arrested for a domestic violence incident involving the father of K.N.'s younger half-brother, I.L. Mother physically attacked I.L.'s father during an argument, leaving scratch marks on his head. K.N. was placed with her maternal grandmother (MGM) pending mother's release from jail. The allegation as to mother was deemed substantiated, and the family successfully participated in a voluntary family maintenance plan until October 2012.

---

[1] Further statutory references are to this code.

2

In August 2012, a referral alleged that mother left K.N. unattended in a tub of ice water for 10 minutes because she was upset that K.N. wet herself. K.N., not yet four years old, also had been observed playing with knives and threatening to kill mother. It was also reported that mother left both children unattended in the car for 30 minutes. These incidents took place at MGM's home, where mother and the children spent most of their time. The household also included a maternal uncle, who reportedly exposed the children to domestic violence incidents with his girlfriend, including one in which the children witnessed the uncle push his girlfriend's head through a wall and drag her across the floor by her hair. The referral was deemed inconclusive.

In April 2022, a referral alleged that mother physically abused K.N. after K.N. arrived at the reporting party's office with a swollen face and a mark under her eye, which K.N. said were the result of mother hitting her multiple times with both an open hand and fist. K.N. said the violence occurred during an argument about K.N.'s clothing wherein K.N. talked back to mother. K.N. reported that mother had also hit her previously, most recently a few weeks earlier. Mother told the clinical social worker (CSW) she had smacked K.N. on the mouth but ended up hitting her face and, apart from smacking K.N. on the mouth once before, denied any prior violence. The referral was deemed inconclusive after the CSW educated mother about appropriate discipline and later observed that the situation had stabilized. Mother enrolled in individual counseling and K.N. opted to rely on her school counselor if necessary.

In January 2023,[2] a referral alleging general neglect of both children by an unnamed perpetrator was evaluated out. Mother told the reporting party that K.N. had been diagnosed with PTSD. Mother had argued with K.N. and taken her phone away. K.N. left and went to MGM's home. At MGM's home K.N. told the CSW that mother made her uncomfortable, made her clean up after her brother and called her a slut. K.N. had sustained a bruise on her neck during a struggle in which mother tried to take K.N.'s phone. K.N. also disclosed that, when she was seven years old, mother made her remove all her clothing because she wore a crop top, and made K.N. go outside naked. K.N. had never reported that incident because her counselor told mother everything K.N. disclosed. Mother agreed to let K.N. stay with MGM a few days until the situation calmed down.

In February, a referral alleging general neglect of both children by mother was deemed unfounded. K.N. had stated during a class that mother tried to run her over, but the reporting party was not sure what happened. The reporting party said K.N. had tried to hurt herself the previous fall by running into the street after breaking windows and furniture in the home. The reporting party worried that K.N. was "in an environment [that was] not stable enough for her recovery." K.N. was expelled from school the day after the referral was made. In March 2023, a referral was made alleging physical abuse and general neglect of both children by mother, the same narrative as in the February 2023 referral. The referral was deemed inconclusive.

---

[2]     Unless otherwise stated, further date references are to calendar year 2023.

On July 26, a referral alleging general neglect of K.N. by an unnamed perpetrator was evaluated out. The reporting party said K.N. had mental health issues, a possible personality disorder, and was no longer receiving services. Mother said she needed help with K.N., who was reportedly drinking alcohol and using drugs, frequently ran away from home, and had physically hurt mother and broken items in the home. K.N.'s most recent runaway incident occurred from July 22 to July 25, when the child was arrested and released to MGM's care. The referral was evaluated out because DCFS believed the family could benefit from the provision of assistance navigating various support services, including mental health services, substance abuse treatment for teenagers, a parent's project, parent/teen conflict resolution, and possibly an informal probation.

A July 30 referral alleged that K.N. had been sexually abused by an unnamed perpetrator. The referral was evaluated out to law enforcement because the alleged perpetrator was not a caregiver. It was reported that mother took K.N. to the emergency room on July 29. The reporting party had learned from law enforcement that K.N. had reported waking up two weeks earlier experiencing vaginal pain and with blood in her underwear. This occurred after K.N. drank alcohol and took nitrous oxide at a party, passed out multiple times and hit her head and pushed off a male friend who tried to touch her while driving her home before K.N. again lost consciousness. It was reported that K.N. might have signs of a sexually transmitted disease and lab results were pending. K.N. told mother about the assault when mother picked her up at someone's house after K.N. had been reported missing since July 26. Mother took K.N. to the hospital and requested a mental health evaluation. According to

5

the reporting party, mother said K.N. had Bipolar Disorder but had ceased participating in any services. K.N. told the reporting party that she did not have suicidal or homicidal thoughts.

A referral on August 1 alleged sexual abuse, exploitation, general neglect, caretaker absence/incapacity. The reporting party said K.N. was supposed to have been discharged from the hospital that day but mother refused to pick her up. Mother wanted K.N. placed somewhere she could not leave. Mother said she had taken K.N. to the hospital on July 31, because of suicidal ideation and sexual exploitation. K.N. denied having suicidal thoughts or being exploited, and the reporting party lacked any other information as to why mother believed K.N. had been exploited. K.N. was reportedly a chronic runaway last reported missing on July 31. The referral was deemed inconclusive.

*B. Events Leading to K.N.'s Detention in this Proceeding*

On August 14, DCFS received a referral alleging that K.N. and I.L. were victims of mother's absence/incapacity. DCFS was informed that police officers had responded the night before to a call from the mother of K.N.'s boyfriend reporting that K.N. was a runaway. The police picked up K.N., who had by then previously been reported missing at least 10 times, most recently by mother on August 12.

DCFS children's social worker spoke with an officer at the station who confirmed the facts in the referral and said mother had refused to pick up K.N. K.N. told the CSW that she had been staying at her boyfriend's home since August 11, without mother's permission. K.N. admitted having left mother's home without permission on previous occasions, because mother would not let her go and do what she wanted and was always seeking to have K.N. hospitalized or otherwise trying to keep her out of

6

mother's home.  On one occasion, mother had succeeded in having K.N. involuntarily hospitalized on a 72-hour hold claiming K.N. wanted to hurt herself, which K.N. denied.

Late on August 14 and into the early morning hours of August 15, police officers and a CSW spent several hours making numerous unsuccessful attempts to contact mother at her home and by phone.  K.N. said mother was home but refusing to answer the phone or door.  K.N. told the CSW that mother called her boyfriend's mother threatening to call the police unless the boyfriend's mother called them first.  Mother did not respond when the boyfriend's mother tried to get her to pick up K.N.

The CSW contacted K.N.'s father, E.G., who claimed he could not care for the child because he was out of state for several weeks.  The CSW returned with K.N. to mother's home.  After several attempts, mother finally answered the door but left the security door closed.  Mother refused to allow K.N. back into her home because the child had engaged in escalating misbehavior, including stealing, not listening to and physically abusing mother, and bringing drugs into the home.  Mother felt unsafe and also worried for her son's safety.  K.N. was taken into protective custody.

In a subsequent phone conversation, mother told DCFS that K.N. had been sexually victimized and diagnosed with several mental health disorders specifically, Oppositional Defiance Disorder (ODD), Post Traumatic Stress Disorder (PTSD) and Bipolar Disorder, but had no prescribed medications.  After the police became involved, mother had enrolled K.N. in counseling which the child discontinued.  Mother told DCFS she would not permit K.N. to return home unless services were put in place with which K.N. had to comply.  DCFS determined that

7

K.N.'s continued detention was necessary as mother was not providing for K.N.'s basic needs, had multiple previous referrals for abuse and neglect, and previous cases with DCFS. DCFS determined that mother was meeting I.L.'s needs and he was not detained nor is he a subject of the instant petition.

On August 16, DCFS filed a petition on behalf of K.N. Pursuant to section 300, subdivision (b)(1), the petition alleged that mother was unwilling and unable to provide appropriate parental care and supervision of K.N. due to the teen's behavioral issues and mental and emotional problems, and involuntarily hospitalization due to suicidal ideation. The petition further alleged that K.N. was a chronic runaway who had exhibited violent behavior toward mother, and that mother's unwillingness and inability to provide K.N. care and supervision endangered the child's physical and emotional health and safety and placed her at risk of serious physical harm and danger.

At the detention hearing on August 17, the juvenile court found E.G. to be K.N.'s presumed (and non-offending) father and detained the child from parental care.[3] Mother was given monitored visitation.

On the morning of August 20, the caregiver with whom K.N. had been placed told DCFS that K.N. had left his home the night before by climbing out of her bedroom window, as shown on his security cameras. The caregiver filed a missing person's report.

The CSW called mother on August 21. Mother was aware that K.N. had disappeared and told DCFS that K.N. and her friend had broken into mother's home and taken her car keys.

---

[3]     E.G. is not a party to this appeal.

Mother did not know where K.N. was, but suspected she was at her boyfriend's. DCFS tried (but was unable) to locate K.N.

On August 24, DCFS received a report that K.N. was at her boyfriend's house from which she had posted a photo on social media while "smoking weed, wax and drinking alcohol." The reporting party said K.N. had broken a window to enter mother's home and tried to steal her car. DCFS and police officers went to the boyfriend's house on August 25, but K.N. was not there. The boyfriend's sister told DCFS that her family had not seen K.N. for two weeks, and that the boyfriend was out of the country in a behavioral institution. DCFS sought a Protective Custody Warrant (PCW) for K.N., which the court issued on August 28.

On August 31, DCFS collected K.N. from the police station after the police picked her up at a friend's home on a missing person's warrant. The CSW escorted K.N. to a clinic, where K.N. claimed she had to use the restroom, then ran away while the CSW was checking her in. DCFS filed another missing person report.

On September 8, DCFS was notified that K.N. was again in police custody, having been picked up on a missing person warrant. The next day, a CSW again transported K.N. to the clinic, where K.N. ran away again while being escorted inside. DCFS filed another missing person report.

On September 11, DCFS made an unannounced visit to K.N.'s boyfriend's home. His sister said K.N. was not there and had not been seen since leaving the family's apartment with the police on September 8.

On September 12, DCFS learned the police found K.N. in a stolen car with other minors and she was again in police custody. Again, K.N. ran away  again after the CSW picked her up at the

9

police station.  The police informed the CSW that K.N. had three criminal cases pending and that a search for the child was underway.  The CSW spoke with mother, who was then residing in a shelter because she feared K.N.  A police officer assigned to K.N.'s case reported concerns about the child's ongoing criminal behavior, which included breaking into mother's home, participating in stealing a car (which resulted in K.N.'s arrest for armed carjacking), and involvement in a robbery with two companions in which a store video showed one of K.N.'s companions pulling out a gun in front of a clerk.  The officer said K.N. would face criminal carjacking charges.

On September 14, DCFS learned K.N. had been booked for carjacking, and was in police custody headed to juvenile hall.  That same day, the Dependency Investigator (DI) reviewed the petition's allegations with mother who stated, " 'I want to say part of it is true.' "  When asked which part was true, mother replied, "unable," but said the "unwilling" allegation was not true.  Mother was asked if she could provide care for K.N. in the event the child was released her care after the jurisdictional hearing.  Mother responded, " 'if [K.N.] has the appropriate services, yes, but if not, no.' "  Mother said that, by " 'appropriate services,' " she meant " '[K.N.] needs a break, she needs a hold.  She is not thinking straight.  She [*sic*] doing drugs is making it a bigger risk. . . .  I need her to be in rehab.  I need her to take classes.' "  Mother opined that K.N. needed anger management counseling because she did not understand the meaning of consequences, and lacked respect for authority at home, school and in public.  Mother suggested K.N. would benefit from " 'a booth [*sic*] camp.  She needs to straighten herself out[,]' " and added, " 'now [K.N.] has criminal charges.  Since I gave her up to

[DCFS].'" Mother said the police no longer paid attention to her because K.N. was a chronic runaway. Each time they simply wrote a report and said there was nothing they could do.

Mother shared information with the DI about what mother believed was an inpatient program from which K.N. could benefit. The DI informed mother that the program was an outpatient program for adults previously hospitalized on an inpatient basis. Mother said an inpatient program would be a better fit for K.N.'s chronic runaway episodes. Mother was informed that the adjudication report would include DCFS's recommendation that K.N. receive wraparound services. With regard to her unwillingness to provide care for K.N., mother informed DCFS that, " 'like I said, I gave her up to the system. The reason I gave her to the system is because that weekend she ran away, she got shot by a gang.' " In mother's opinion, the onus was on DCFS " 'to protect the child, and that is what [mother] wanted for [K.N.] to be protected.' "

Mother confirmed that the diagnoses for K.N. reflected in the petition were true as alleged and agreed that K.N. " '[was] at risk for physical harm, damage, and danger.' " Mother said K.N.'s diagnosis for PTSD was made when the child was in middle school, and that K.N. was diagnosed with ODD in July 2023. Mother said law enforcement returned K.N. after she ran away and the " 'protocol was to take her to the ER and that is what I did. That is where she was diagnosed.' " Mother also said K.N. had been diagnosed with bipolar disorder the year before " 'when she was at the hospital when she had the suicidal attempt.' " Mother told DCFS that K.N. had attempted suicide more than three times and was receiving services. In the past, K.N. made statements to mother such as " 'you better fucking go

11

or I will jump out of the window.' " Mother was advised to let K.N. go. Mother also said K.N. told MGM that " 'she was going to kill herself with [a] gun.' "

Mother told DCFS she had not spoken to K.N. recently, but she had received a call from the police on September 8 after K.N. was again detained. MGM called mother after K.N. found MGM at a nail salon on September 9. MGM said K.N. had been in the restroom for over 15 minutes, and MGM was instructed to call the police. Mother went to the nail salon where she found K.N. unconscious on the floor and, after she was unable to wake her, called 911. K.N. had consumed alcohol and smoked "pens." At the hospital, K.N. tested positive for marijuana. Mother told hospital staff that K.N. was in DCFS custody, but the hospital released the child anyway. Mother asked " 'How is it that [K.N.] escapes and she runs away? [She] is manipulative and tends to lie.' " Mother said that K.N.'s runaway behavior had begun in March or April 2023 when " 'she ran away . . . for 2 weeks and ended up at [MGM's] house. [MGM] said she wouldn't mind having [K.N.] under her care.' " Mother said K.N. stayed with MGM for about a month, then called mother to pick her up. Mother's was concerned about K.N. who was defiant, manipulative, a liar, and aggressive. In short, it had to be ' "[K.N.'s] way or the highway.' " Mother was currently residing in a shelter because she had become afraid of K.N. and her friends after they broke into her home. She asked that her address remain confidential.

The DI interviewed MGM who said K.N. had done well when she stayed with MGM for about two months. MGM told the DI that K.N. had problems with drugs, alcohol, violence, talking back, and running away from home. MGM was not concerned

12

about mother's care of K.N. but said that K.N. and mother lied a lot. MGM disagreed with mother's decision to call the police on K.N. after the two fought and also disagreed with mother's decision to press criminal charges against her daughter, thereby creating a criminal record for the teen. MGM told the DI that K.N. had come to her house during a recent AWOL episode. She told MGM that she had a gun, had sold it and had given the money to her boyfriend's mother. K.N. showed MGM videos displaying drugs and guns. K.N. told MGM that she had given her boyfriend's mother a lot of money to save. MGM believed K.N. had money because " 'they were stealing cars. [K.N.] and the other children, they cannot be more than 12 and 14.' "

The PCW was recalled on September 25. DCFS informed the court the petition's allegations were true as alleged because mother was unable and unwilling to provide care for K.N. and had not wanted the child released to her care during DCFS's initial investigation. Later mother told DCFS she would be able to care for K.N. with appropriate services in place, but also said she was living in a shelter because she feared K.N., whom mother said was affiliated with a gang. Mother again confirmed K.N.'s past diagnoses and said K.N. did not have medication, although the child previously had been prescribed medication which K.N. did not want to take.

In its report for the jurisdiction/disposition hearing, DCFS informed the court that K.N. was currently in law enforcement custody, and the agency would submit a supplemental report with K.N.'s statements. DCFS recommended that the petition be sustained as alleged, and that K.N. be declared a dependent of the court. DCFS also recommended that K.N. be assessed and participate in services including mental health and wraparound

13

services, and that the family receive reunification services. DCFS also recommended that a case plan for mother include individual therapy to address case issues (including her history as a perpetrator of domestic violence), parenting classes, random drug tests (and, in the event she tested positive for drugs or alcohol, completion of a drug program), as well as joint counseling with K.N. once the teen's therapist deemed it appropriate.

The DI interviewed K.N. at juvenile hall on September 21, where the child had been housed since her arrest on September 15 for carjacking. K.N. denied engaging in any criminal wrongdoing. She told DCFS that she ran away because of mother, whom she did not believe was able to care for her. K.N. did not believe she had been diagnosed with ODD or bipolar disorder but wanted to be evaluated. K.N. denied the allegation of gun possession and started to leave the interview when they asked her about mother's claim that K.N. was involved in gang activities and had been shot. K.N. told the DI, " '[mother] is lying.' "

### C. Jurisdiction Hearing

The jurisdiction hearing was conducted on September 28. Mother's counsel requested that the hearings be continued. In part, this request was made because mother wanted the court to consider K.N.'s statements, which DCFS had indicated would be included in a supplemental report, and because K.N. had been AWOL for several weeks and the parties had not heard from her since the last court date. Mother's attorney said she planned to seek release of K.N. to mother's care and noted that mother was concerned because K.N. had called her on September 26 threatening to harm herself. The court proceeded with the jurisdiction hearing but indicated its intent to obtain additional

14

information relative to K.N.'s placement before conducting the disposition hearing.

Proceeding with the adjudication, K.N.'s counsel requested that the court sustain the petition, with an amendment eliminating language about K.N.'s mental health diagnoses as the record contained only mother's statements as to those. Counsel observed that mother had a lengthy history of referrals regarding her care of K.N., and that the teen's behavioral and emotional problems manifested in her running away. The court observed that mother seemed willing to care for K.N. but needed help managing her daughter's mental health and behavioral issues.

Mother's counsel requested that the court strike the entire petition. Counsel noted that because mother had "initially [been] unable to take care of" K.N., DCFS added the "unwilling" language after mother sought DCFS assistance. Counsel noted that mother said she had "give[n] [K.N.] up to the [DCFS] . . . 'because the weekend she ran away, she got shot by a gang.' . . . [M]other believe[d] that it was [DCFS's] responsibility to protect the child." Counsel said mother remained willing to care for K.N. with "appropriate services" in place, such as an inpatient drug program, and behavior or anger management classes with wraparound services. Mother's counsel observed that mother had rushed K.N. to the hospital and sought medical help multiple times. Counsel also noted that K.N. had run away multiple times since the initiation of the instant dependency proceeding and found it ironic that DCFS claimed mother was unable to care for K.N., when DCFS itself was unable to keep K.N. from running away.

15

Mother's counsel stated that, "the most important thing to note is the child has never faced any criminal charges while under mother's custody[,]" adding, "clearly, we see [DCFS] is not able to take care of [K.N.] and help mother. [¶] We have law enforcement now intervening. I think the agency that should take over is L.A.P.D. [¶] [K.N.] should . . . ultimately . . . be released to mother's custody when this petition is dismissed, and the mother will work with L.A.P.D. . . . to resolve the issues that [DCFS] failed to help mother resolve." Counsel observed that the CSW had "blown [mother] off", telling her " 'I have a lot of other children that I need to tend to, and your daughter is not my only priority.' "

DCFS requested the court sustain the petition as pled as the evidence demonstrated mother was both unable and unwilling to care for K.N. The juvenile court struck the language regarding K.N.'s mental health diagnoses and mother's unwillingness to care for the child and sustained the petition as amended. In doing so, the court explained: "I think the statements that [mother] made to the social worker indicate her being desperate, and this has been going on for quite a long time. So, [mother] clearly doesn't have the tools to be able to handle [K.N.] at this time, and that's why I'm finding the word 'unable' is a more appropriate reflection of how mother feels and the evidence before the court."

The disposition hearing was continued pending updates regarding K.N.'s well-being and services available in the juvenile justice system, and details regarding the criminal charges against her. DCFS was ordered to establish a schedule for mother's monitored visitation.

16

At the disposition hearing on December 13, the court declared K.N. a juvenile court dependent, found it would be detrimental to return the child and removed her from parental care. Mother's case plan included drug testing of mother (upon reasonable suspicion of drug use), joint counseling with K.N. (when deemed appropriate by the child's therapist), and individual and parenting counseling. Mother was given monitored visitation.

Mother filed this timely appeal.

## DISCUSSION

Mother's sole contention on appeal is that the record contains insufficient evidence to support the juvenile court's assertion of jurisdiction over K.N.[4] We disagree.

## I. Substantial Evidence Supports the Jurisdictional Findings.

### A. Controlling Legal Principles and the Standard of Review

The juvenile court's exercise of jurisdiction in this action rests on section 300, subdivision (b)(1). In pertinent part, that provision authorizes the assertion of dependency court jurisdiction where a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm . . . as a result of" a parent's "inability . . . to adequately supervise or protect the child." (§ 300, subds. (b)(1)(A) & (b)(1)(D).) A jurisdictional finding under this provision does not require a showing that the child's parent is " 'neglectful,' " " 'blameworthy,' " " 'unfit,' " or "at fault" for their inability to supervise or protect their child. (*In re R.T.* (2017) 3 Cal.5th 622,

---

[4] Mother appealed from but does not take independent issue with the court's dispositional orders.

17

627, 630 (*R.T.*).) The statute merely requires a showing of "the parent's . . . 'inability . . . to adequately supervise or protect the child.'" (*Id.* at p. 629.) The Legislature's omission of a culpability requirement in "'was purposeful.'" (*Id.* at p. 630.)

We review a court's jurisdictional findings for substantial evidence, asking whether the record—viewed as a whole and drawing all reasonable inferences in support of the court's findings—contains "" 'sufficient facts to support [its jurisdictional] findings.'"" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We do not reweigh the evidence or exercise our independent judgment. Our job is only to determine if the record contains sufficient evidence, contradicted or not, to support the jurisdictional findings. (*Ibid.*; accord, *R.T., supra*, 3 Cal.5th at p. 633.) As appellant, mother bears the burden to show there is no substantial evidence to support the juvenile court's order. (*In re L.B.* (2023) 88 Cal.App.5th 402, 412.) Substantial evidence is evidence that is reasonable, credible and of solid value, and "may include inferences, so long as any such inferences are based on logic and reason and rest on the evidence." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 318.)

### B. Application

Mother asserts that the evidentiary record does not support the court's finding that, at the time of the jurisdictional hearing, she lacked the ability to provide care for K.N. Rather, she maintains that her efforts to obtain DCFS's assistance with her child's behavioral problems by seeking placement for the child in an inpatient program, demonstrates her "acknowledgement that [K.N.] needed help beyond what was available in the community." Mother maintains that her request for DCFS's help demonstrates her ability to care for K.N., not an inability to do

18

so. DCFS correctly points out that mother advances contrary assertions: "Mother simultaneously advocates that she was able to care for K.N. from the very moment the juvenile court dismissed the petition while also acknowledging that her ability to care for K.N. was contingent on K.N. being placed in a secure facility rather [than] in mother's home."

Mother's attempt to distinguish this case from *R.T., supra,* 3 Cal.5th 622, is unavailing. In *R.T.*, the California Supreme Court concluded a mother appeared to have given up on and was unable to supervise her 17-year-old whose behavior included running away from home, making false reports of parental abuse, and giving birth at age 15 and shortly thereafter to two children who themselves became juvenile court dependents. (*Id.* at pp. 624-625, 627, 633-637 [affirming dependency court jurisdiction where child "faced an ongoing risk of harm based on her increasingly self-destructive behavior, behavior that mother simply could not control."].) Mother attempts to distinguish *R.T.* and demonstrate her willingness to care for K.N. and the fact that she never gave up on her daughter. Mother points to her past efforts to obtain therapy for K.N., having the teen hospitalized for suicidal ideation, her unsuccessful efforts to obtain assistance from the police who knew K.N. was a chronic runaway and regularly picked her up, and her efforts to reach out to DCFS for help prior to the incident that prompted this proceeding. Mother argues that her efforts to address K.N.'s delinquency court involvement, behavioral issues and hospitalization, and her unsuccessful attempts to obtain help

19

from DCFS, demonstrate that, unlike the parent in *R.T.*, she "had clearly not given up."[5]

---

[5] In her brief, mother twice mentions that, before the juvenile court became involved, she tried addressing K.N.'s issues with therapy and hospitalizations, and then "[w]hen [she] reached out to DCFS . . . she received no" meaningful assistance. The record does not support mother's claim that she had not "giv[en] up." The portions of the record mother claims evidence her ability to care for K.N. by way of seeking DCFS's help consist of two referrals DCFS received in July 2023 in which the reporting parties were anonymous Second, regardless of who called in those referrals, mother's contention that "she received no help" and "DCFS had not provided meaningful assistance" is belied by the contents of the narratives to which mother points.

DCFS concluded that the first referral dated July 26 alleged neither harm to K.N. nor neglect of the child's basic needs. DCFS concluded the allegations did not constitute appropriate child abuse referrals and the referral was instead "[e]valuated out to CPL [Community Prevention Linkages]" because DCFS believed the family might benefit from assistance navigating support services such as "mental health services, [s]ubstance abuse treatment for teenagers, parent's project, parent teen conflict. . ." Mother told the CSW that she was already working with DCFS which was servicing the family. The record reflects that K.N. was arrested on July 25 for battery, and one way DCFS was able to assist the family was by holding a multi-disciplinary team (MDT) meeting, which occurred on July 31.

The second referral from July 30 which mother claims resulted in no help from DCFS involved an allegation of sexual abuse of K.N. by an unnamed perpetrator, which was evaluated out to law enforcement because the alleged perpetrator was not a caregiver. Also notable with respect to mother's claim that she received no help from DCFS after making this referral is the fact that another referral was generated the next day after mother

20

On the contrary, mother's contention that she had not "given up" on K.N. notwithstanding DCFS's purported failure to help her actually reflects mother's historical and ongoing inability properly to provide appropriate care for K.N., which resulted in mother leaving K.N. with either MGM and, on occasion, the boyfriend's mother, or simply refusing to retrieve the child from the hospital so mother would not be burdened by bringing K.N. home, only to have her leave again.

Mother also relies on *In re David M.* (2005) 134 Cal.App.4th 822 (*David M.*), to support her contention that "[e]ven if [her] initial refusal to have [K.N.] returned to her can be characterized as 'previous neglect,' she was willing to have [K.N.] returned with help from DCFS at the time of the jurisdictional hearing." Her reliance is misplaced. In *David M.*, a toddler and his newborn sister were detained due, in part, to their mother's drug abuse during her pregnancy. (*Id.* at p. 826, abrogated by other grounds in *R.T., supra*, 3 Cal.5th at pp. 628-630.) The court found that, even if the parent's past conduct was probative of current conditions, the question was whether, at the time of the jurisdictional hearing, the child remained subject to the defined risk of harm. (*Id.* at p. 831.) In *David M.*, the court found no evidence that mother's substance abuse impacted her ability to care for the children. (*Id.* at p. 830.) Moreover, the mother had 18 negative drug tests between the detention and jurisdictional hearings. (*Ibid.*) Accordingly, the court concluded that no risk of substantial harm existed at the time of the jurisdictional hearing. (*Id.* at pp. 831–832.)

---

refused to pick K.N. up from the hospital because she wanted the child placed somewhere she could not leave.

This case is different. Mother's assertion that she was at all times willing and able to care for K.N. ignores the fact that the court struck "unwilling" from the petition. Her argument fails because it was mother's inability to care for K.N., not her unwillingness to do so, that was at issue and, unlike *David M.*, that inability had not abated by the time of the jurisdictional hearing. Mother maintains that she was able to care for K.N. on the condition that DCFS place the teen in an inpatient program or secure facility. This argument is consistent with mother's stated requirement in the initial referral that K.N. comply with services before mother would let her back into the home. Thus, unlike *David M.*, mother does not claim or show that anything changed by the time of the jurisdiction hearing to demonstrate her *ability* to care for K.N. in ways she had not been able to do two months before when she forbade K.N. from returning home. The record supports the juvenile court's reasoned conclusion that mother remained unable to care for K.N. at the time of the jurisdictional hearing.[6]

Section 300, subdivision (b)(1), permits the assertion of jurisdiction when a parent is unable to care for a child despite the parent's efforts to address the child's behavioral issues. (§ 300,

---

[6] Also without merit is mother's argument that "her assessment of her child's needs, namely that she needed some sort of setting where [K.N.] could not avoid treatment, was validated by the section 241.1 report" on which DCFS signed off. First, that report does not demonstrate that mother was unable to provide appropriate care for K.N. absent court intervention. Moreover, the section 241.1 report was prepared after the petition was sustained and considered facts that had were not in evidence at the time the court made the findings challenged on appeal.

subd. (b)(1).)  It is undisputed that K.N. had "mental and emotional problems."  Not only did K.N. "refus[e] mother's efforts to provide treatment for her," but she also had problems in school which resulted in her expulsion, ran away with increasing frequency, and had begun associating with gang members and engaging in criminal behavior.  K.N. acted out at school and at home, often violently.  It was because of these increasingly serious and threatening behaviors that mother feared K.N. and refused to let her return home.  Mother has consistently maintained that the only way she would accept K.N. back was if the child remained "in a placement where she could not leave and refuse services."

Furthermore, as a result of her daughter's troubling behavior, mother felt unsafe in her own home, had moved into a confidential shelter at the time of the jurisdiction hearing, and asked that her location not be divulged.  When interviewed by the DI, mother conceded she was unable to care for K.N.

Without assessing blame, the evidence is clear that the assertion of dependency jurisdiction was warranted.  (*R.T., supra,* 3 Cal.5th at p. 634 ["Whether it was [the child]'s misbehavior and disobedience, or [the] parent's inability to supervise or protect [the child], that initiated this cyclical pattern of conflict, does not matter . . . .  The basis for jurisdiction under section 300(b)(1) is whether the child is at 'substantial risk' of 'serious physical harm . . . .' "].)  " 'The loss of parental control is rarely if ever attributable solely to the parent or the child.  It is instead the result of a long and complicated chain of actions and reactions culminating in the child's refusal to submit to parental authority.' " (*Id*. at p. 635.)  Like the mother in *R.T.*, "there is

23

little question that mother was unable to 'adequately' supervise or protect [K.N.] as required under section 300(b)(1)." (*Ibid.*)

Based on the evidentiary record, the juvenile court reasonably concluded that mother was unable "to adequately supervise or protect [K.N.]" and we must affirm. (§ 300, subd. (b)(1); *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394, abrogated on other grounds by *R.T., supra*, 3 Cal.5th at pp. 628-630 [When the juvenile court's findings are reasonable in light of the whole record, the findings sustaining the section 300 petition should be affirmed.].)

## II. The Juvenile Court's Dispositional Order is Affirmed.

Mother has not challenged the court's dispositional orders on appeal on any independent basis. She argues only that, because the assertion of jurisdiction was unsupported, the dispositional orders also must fail. In light of our conclusion that substantial evidence supports the court's jurisdictional findings, we also affirm the dispositional orders.

### DISPOSITION

The jurisdictional findings and dispositional orders are affirmed.

RICHARDSON, J.

We concur:

LUI, P. J.

ASHMANN-GERST, J.

24